### COMMONWEALTH *vs.* VICTORIA GOODALL.

Bristol.    October 25, 1895. — April 8, 1896.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Disorderly House — Instructions — Common Law and Statute.*

At the trial of a complaint for keeping a disorderly house, the judge refused to rule, as requested by the defendant, that "the jury, in order to convict, must be satisfied that, while the defendant kept the house, it was habitually resorted to by drunkards, thieves, and prostitutes, who were either drinking, tippling, cursing, swearing, quarrelling, or otherwise misbehaving themselves, and it is not sufficient to support a conviction to prove that during a part of the time women whose reputation for chastity was bad frequented or resorted to the house"; and instructed the jury as follows: "A disorderly house is a house kept in such a way as to disturb, annoy, or scandalize the public generally, or the neighbors and passers by, or for the purpose of public resort for thieves, drunkards, prostitutes, or other idle and vicious people; and if the defendant kept the house for the harboring of prostitutes that they might resort to it and frequent it for the purpose of prostitution, and if she did so harbor prostitutes and they did so resort to it, frequent, and use it, the jury may convict." *Held,* that the defendant had no ground of exception.

The common law offence of keeping a disorderly house has not been in any part repealed or modified by Pub. Sts. c. 101, § 6, or by c. 207, § 13, and a conviction may be had although, at the trial of a complaint for such offence, the evidence shows that the house is not disorderly otherwise than as a place resorted to for immoral practices. KNOWLTON, J. dissenting.

COMPLAINT to the Second District Court of Bristol, for keeping a disorderly house from June 1 to December 18, 1894, at Fall River. Trial in the Superior Court, on appeal, before *Sheldon,* J., who allowed a bill of exceptions, in substance as follows.

The government offered evidence tending to prove that, at about eleven o'clock on the night of December 15, 1894, a squad

of police of Fall River went to the house kept by the defendant, and demanded admission, notifying her at the same time that they had a search-warrant for the premises, that they found the outer doors secured by chains on the inside, and the defendant did not remove the chains and allow them to enter until two or three minutes after they had demanded admission; that the premises consisted of about twenty rooms on the upper floor of a building on Bedford Street in Fall River; that, in searching the premises, they found five men in the sitting-room; that, as the officers were entering the house, the defendant went up stairs and called two women by name; that the officers then went up stairs and found in one room a woman named Marcelle and a man; that the man had his hat, coat, and vest off, and the woman had nothing on but her chemise and stockings; that in a second room up stairs the officers found a woman named Fisher getting out of bed, and found empty lager beer bottles in the room; that in a third room they found three empty lager beer bottles and a glass with about a spoonful of beer in it; that in a fourth room they found eleven empty lager beer bottles and a glass; that a woman named Gay came up to the room and said it was her room; and that most of the bottles in the room had drainings in them, and the bed looked as though it had been slept in, and one of the officers testified that, when they went in, he saw a woman and a man come out of the room off the entry.

The government offered further evidence tending to prove that, on June 14, 1894, a police officer went to the house, saw the defendant, and told her that, if she had been carrying on business, she must quit, and send the girls off; that the defendant said that she would send them off; that there were then four girls stopping in the house; that the officers afterwards went there several times, and the defendant said she had sent the girls away; that on the night of November 14, 1894, two police officers visited the house kept by the defendant, and asked permission to search; that she at first refused to allow them to do so, saying that it would hurt her business if they were to search her rooms, but finally told them that, if they would give her a few minutes to notify the people in the rooms, they might search; that the officers assented, and the defendant went up stairs, and came down with a girl she called Trixie; that then they went up stairs

to search, and found a soldier in bed in one of the rooms; that, at the time of this search, they found four girls in the house whose reputation for chastity was bad; and that, on several occasions, persons under the influence of liquor had been seen entering the premises of the defendant as late as eleven or twelve o'clock at night. Witnesses for the government testified that they never heard any extraordinary or unusual noise about the premises, but that on two occasions the defendant sent for them as police officers to remove persons who were making a noise in the house; and that there was a sign on the front door, "Furnished rooms to let."

The defendant requested the judge to instruct the jury, that the keeping of a house of ill fame is not included in the offence of keeping a disorderly house; that the offence of keeping a disorderly house is not a bar to a complaint for keeping a house of ill fame; that the jury must acquit the defendant unless they found that, while the defendant kept the house, she permitted it to be the habitual resort of drunkards, thieves, and prostitutes, who were either drinking, tippling, cursing, swearing, quarrelling, or otherwise misbehaving themselves; and that the jury, in order to convict, must be satisfied that, while the defendant kept the house, it was habitually resorted to by drunkards, thieves, and prostitutes, who were either drinking, tippling, cursing, swearing, quarrelling, or otherwise misbehaving themselves, and it was not sufficient to support a conviction to prove that, during a part of the time, women whose reputation for chastity was bad frequented or resorted to the house.

The judge refused to give the instruction requested, but submitted the case to the jury with the following instruction: "A disorderly house is a house kept in such a way as to disturb, annoy, or scandalize the public generally, or the neighbors. and passers by, or for the purpose of public resort for thieves, drunkards, prostitutes, or other idle and vicious people; and if the defendant kept the house for the harboring of prostitutes that they might resort to it and frequent it for the purpose of prostitution, and if she did so harbor prostitutes and they did so resort to it, frequent, and use it, the jury may convict."

The jury returned a verdict of guilty; and the defendant alleged exceptions.

*J. W. Cummings,* for the defendant.

*A. J. Jennings,* District Attorney, for the Commonwealth.

LATHROP, J.   The offence charged in the complaint is a common law offence.   The defendant concedes in her brief "that upon all the evidence, direct and circumstantial, the jury might have been warranted in returning a verdict of guilty"; but contends that the latter part of the instruction requested should have been given, and that the court should have instructed the jury that merely resorting to the house, without misconduct in it, of women whose reputation for chastity was bad was not sufficient to warrant a conviction.

We are of opinion that the instructions given were sufficient, and that the instruction asked should not have been given.   In *Commonwealth* v. *Cobb,* 120 Mass. 356, the instructions given were held to be correct; and one of them was this: "The nuisance may consist in allowing the place to be so noisy and disorderly as to disturb the public peace and annoy the neighborhood.   But it is not necessary to show any such noise, because the nuisance may consist in drawing together dissolute persons engaged in unlawful practices, thereby endangering the public peace and corrupting good morals."   See also *Commonwealth* v. *Cardoze,* 119 Mass. 210; *The Queen* v. *Rice,* L. R. 1 C. C. 21; *Thatcher* v. *State,* 48 Ark. 60; *Beard* v. *State,* 71 Md. 275; *State* v. *Williams,* 1 Vroom, 102.

The other exceptions taken at the trial were not argued, and we regard them as waived.

Since the argument of the case it has been suggested that the common law offence of keeping a disorderly house can no longer be proved by evidence that the house is a bawdy-house, unless it is disorderly otherwise than as a place resorted to for immoral practices.   In support of this suggestion we are referred to the Pub. Sts. c. 207, § 13, which prescribe the punishment for keeping "a house of ill fame, resorted to for the purpose of prostitution or lewdness," and to the Pub. Sts. c. 101, § 6, which provide: "All buildings, places, or tenements resorted to for prostitution, lewdness, or illegal gaming, or used for the illegal keeping or sale of intoxicating liquor, shall be deemed common nuisances."

The provisions of the Pub. Sts. c. 207, § 13, originated in the

St. of 1793, c. 59, § 8, and have been in the statutes, with some change of penalty, ever since. Rev. Sts. c. 130, § 8. St. 1849, c. 84. Gen. Sts. c. 165, § 13.

The provisions of the Pub. Sts. c. 101, § 6, have been in force since the St. of 1855, c. 405, § 1. Gen. Sts. c. 87, § 6.

The common law offence of keeping a disorderly house may be proved in various ways: by showing that the accused kept a common bawdy-house, a common gaming-house, or a disorderly place of entertainment. See Steph. Dig. Cr. Law, art. 179. In *Commonwealth* v. *McDonough*, 13 Allen, 581, 584, Mr. Justice Chapman, speaking of the offence at common law, said: "Brothels and gaming-houses were held to be nuisances under all circumstances; but alehouses were not, unless they became disorderly."

At common law a person could be indicted for keeping a bawdy-house, for keeping a gaming-house, or for keeping a disorderly place of entertainment, or he might be indicted for keeping a disorderly house, and convicted by proof of any or all of the distinct offences.

If the common-law offence of keeping a disorderly house no longer applies to a house of ill fame, it also no longer applies to a house where illegal gaming is carried on, or to one which is disorderly and where intoxicating liquor is sold. But we find no intimation to this effect in our reports since the St. of 1855 was passed, over forty years ago. On the other hand, there is much to show that it has always been the understanding of the court that the common-law offence of keeping a disorderly house still remained. Thus, in *Commonwealth* v. *McDonough*, 13 Allen, 581, where, pending a complaint for selling intoxicating liquors, the penalty was changed by statute, which contained no saving clause as to cases pending, and it was therefore held that the defendant must be discharged, it was said by Mr. Justice Chapman, "As it is not alleged that the defendant kept a disorderly house, he cannot be held guilty of an offence at common law." 13 Allen, 585.

In *Commonwealth* v. *Kimball*, 7 Gray, 328, there were two counts in the indictment, one at common law, for keeping a disorderly house, and the other on the St. of 1855, c. 405, § 1. It was said by Mr. Justice Bigelow: "There was no misjoinder

of counts in the indictment. The offences charged in the two counts, being of the same nature, might well be included in one indictment." While this remark was *obiter*, as the first count was abandoned by the government during the trial, it indicates what was supposed to be the law.

So in *Commonwealth* v. *Davenport*, 2 Allen, 299, there was a count at common law for keeping a disorderly house, and one under the Gen. Sts. c. 87, § 6. The defendant was convicted on both counts. A new trial was granted on the first count for error in the admission of certain evidence. See also *Commonwealth* v. *Cardoze*, 119 Mass. 210, and *Commonwealth* v. *Cobb*, 120 Mass. 356, for instances of prosecutions being maintained at common law which would fall within the statute.

In *Jennings* v. *Commonwealth*, 17 Pick. 80, it was held, on a writ of error, that an indictment could be maintained at common law for keeping a house of ill fame; and that the St. of 1793, c. 59, § 8, on the same subject, did not, by implication, repeal the common law.

In *Commonwealth* v. *Rumford Chemical Works*, 16 Gray, 231, it is said: " But it is never to be presumed that the Legislature intended to make any innovations upon the common law further than is absolutely required upon a just interpretation of the provisions of its positive enactments. And this, it is said by Chancellor Kent, has been the language of the courts in every age. 1 Kent Com. (6th ed.) 464. In the decisions of our own, it has often been recognized as an established rule that a statute is not to be construed as a repeal of the common law unless the intent to alter it is clearly expressed. *Commonwealth* v. *Knapp*, 9 Pick. 514. *Melody* v. *Reab*, 4 Mass. 473. It is a direct and necessary consequence from this principle, that a statute may be in affirmance of the common law, adding new regulations and supplying additional remedies, but leaving in full force those which might before have been resorted to for the redress of public or private grievances."

The Legislature has also, in defining the jurisdiction of inferior courts, shown that there was no intent to repeal the common law offence by the enactment of the act relating to nuisances. Thus the St. of 1863, c. 78, § 1, gives to police courts " concurrent jurisdiction with the Superior Court of all

offences" under the Gen. Sts. c. 87, §§ 6, 7, "and of all complaints under the common law, for the keeping and maintenance of a common, ill governed, and disorderly house."

The language of the Pub. Sts. c. 155, § 53, relating to trial justices, is the same, except that the Pub. Sts. c. 101, §§ 6, 7, are mentioned instead of the corresponding sections in the General Statutes. These provisions are also applicable to police and district courts, by the Pub. Sts. c. 154, § 11.

The St. of 1893, c. 396, § 39, which relates to police and district courts, gives to such courts jurisdiction "of all nuisances at common law; and of the offence at common law of keeping and maintaining a common, ill governed, and disorderly house."

In the opinion of a majority of the court, the common law offence of keeping a disorderly house has not been repealed by the Pub. Sts. c. 101, § 6, or by c. 207, § 13, although the evidence shows that the house is not disorderly otherwise than as a place resorted to for immoral practices.

*Exceptions overruled.*

KNOWLTON, J. Our Legislature has enacted statutes providing fully for the prosecution and punishment of keepers of houses of ill fame. Pub. Sts. c. 207, § 13; c. 101, § 6. I cannot agree that such offenders are still liable to prosecution and punishment in this Commonwealth at common law. It is a familiar doctrine, that, when a statute is enacted covering the whole subject of punishment for a crime, there is no longer any place for the operation of the common law under which the crime previously had been punished. The statute supersedes the former mode of proceeding that was adopted by the courts for want of a statute. *Commonwealth* v. *Cooley,* 10 Pick. 37. *Commonwealth* v. *Rumford Chemical Works,* 16 Gray, 231. *Commonwealth* v. *McDonough,* 13 Allen, 581. *Commonwealth* v. *Dennis,* 105 Mass. 162.

A disorderly house as defined by the courts in proceedings at common law is not a house which has certain special criminal features caused by a particular kind of unlawful use. The keeping of such a house is not a crime like larceny or murder, the commission of which implies a special, recognized kind of criminal act. The term "disorderly house" at common law includes every house that is so kept as directly to disturb public

order at the time, or to tend to the corruption of public morals, and the ultimate disturbance of the general good order of the community. *Commonwealth* v. *Cobb*, 120 Mass. 356. *The Queen* v. *Rice*, L. R. 1 C. C. 21. 1 Bish. Crim. Law, § 1107, and cases cited. Bawdy-houses, common gaming-houses, unlicensed or improperly conducted playhouses, and disorderly inns or ale-houses are all disorderly houses, even though they do not create a public disturbance in the neighborhood. The keeping of any one of these was indictable at common law, because such a house is a nuisance. The offence of keeping it is a single one, and can be punished but once, whether the term disorderly is used in the indictment or not. It cannot be indicted or punished in any form without alleging and proving the element of illegality which makes the house " disorderly " within the meaning of the word as used in prosecutions at common law for keeping " a common, ill governed, and disorderly house." In my opinion, it is too clear for argument that at common law a conviction upon a charge of " keeping a common, ill governed, and disorderly house, to wit, a house of ill fame, resorted to for prostitution and lewdness," was a bar to a prosecution under any other form of allegation for keeping the same house at the same time, if it was not unlawfully kept otherwise than by using it as a house of ill fame. A house of ill fame is merely one kind of a disorderly house, and when the offence of keeping it is made the subject of a statute which purports fully to cover the crime, it is, in my opinion, taken out from the common law in regard to disorderly houses, and that part of the common law is left to apply to all other kinds of disorderly houses which have not been made subjects of legislation. Of course any house of common resort is disorderly so as to subject its keeper to punishment at common law if it is so noisy as to disturb the neighborhood. Whether it is a house of ill fame or not, it is a disorderly house of a different kind from a quiet house of ill fame, and at common law it is punishable under an allegation of facts of a different kind that constitute the disorderliness. Different allegations covering every kind of disorderly house may be joined in one indictment without making the pleading bad for duplicity, and there must always be both an allegation and proof of particular facts which make the house disorderly.

The punishments required by our statutes above cited are by fine or imprisonment in the house of correction not exceeding specified terms. The punishment at common law was by fine or imprisonment in the jail for a term not specified by any enactment, but determined by the court in the exercise of its discretion. Under the opinion of the court in the present case, a keeper of a house of ill fame who commits a single well defined offence, which is punishable in but a single aspect of it, may be proceeded against, at the option of the prosecutor, either under the Pub. Sts. c. 101, § 6, or under the Pub. Sts. c. 207, § 13, or under the common law for keeping a disorderly house, each one of which forms of proceeding subjects the offender to a possible punishment different from that called for under either of the others. In my opinion, it is contrary to fundamental prin ciples of criminal jurisprudence to make the commission of one offence subject the wrongdoer to different forms of prosecution and different kinds of punishment at the election of the prosecutor. It is not like the case of a statute which makes punishable as distinct offences different acts in the same general course of criminal conduct, like the act of selling intoxicating liquor, the act of keeping intoxicating liquor for unlawful sale, and the act of keeping a tenement used for the unlawful sale of intoxicating liquor, each of which acts is different from the others. Here is but a single act, the keeping of a certain house, and there is but a single phase of the act considered in the different modes of proceeding. In *Commonwealth* v. *Davis*, 11 Gray, 48, it was held that the St. of 1855, c. 405, §§ 1, 2, repealed the former statute in regard to houses of ill fame, (Rev. Sts. c. 130, § 8, Pub. Sts. c. 207, § 13,) because it covered the whole subject. Does not that decision plainly assume that the common law in regard to houses of ill fame had been superseded ? But the common law in regard to houses of ill fame was the common law in regard to this particular kind of disorderly houses, for the common law did not punish the offence twice in two different forms. Upon the revision of our laws in 1860, the repealed section of the statute referred to in *Commonwealth* v. *Davis* was retained, probably inadvertently, so that it appears with the St. of 1855, c. 405, §§ 1, 2, in the new enactment. Gen. Sts. c. 87, §§ 6, 7 ; c. 165, § 13. In *Commonwealth* v. *Ballou*, 124

Mass. 26, it was decided that, because these different provisions were enacted at the same time, the Legislature, having power to enact both, must be deemed to have intended that both should stand together, and that a keeper of a house of ill fame might be proceeded against under either statute, at the option of the Commonwealth.

I can find nothing in our law which seems to me in conflict with the view which I have expressed. Certainly the statutes and decisions which recognize the continued existence of the common law offence of keeping a disorderly house do not touch the question at issue. No one doubts that the common law is still applicable to the keeping of all kinds of disorderly houses except those that the Legislature has seen fit to make the subjects of statutory provisions. Such provisions have been made in regard to houses resorted to for illegal gaming, as well as houses of ill fame. *Jennings* v. *Commonwealth*, 17 Pick. 80, cited in the opinion of the majority, seems to me to be in accordance with my view. It was decided on the ground that the St. of 1793, c. 59, § 8, did not purport to be a statute for punishment of the offence of keeping a house of ill fame, but was a part of "An Act providing for the relief and support, employment, and removal of the poor." The opinion says, by implication, that if an act had been passed such as was subsequently enacted in the Rev. Sts. c. 130, § 8, it would have repealed the common law in regard to houses of ill fame. *Commonwealth* v. *Cobb*, 120 Mass. 356, does not deal with the question which I have discussed. The case was one of actual disorder and public disturbance. There was nothing in it that bears upon the question whether our statutes in regard to houses of ill fame and houses resorted to for illegal gaming leave these offences still subject to prosecution at the common law. The same is true of *Commonwealth* v. *Cardoze*, 119 Mass. 210.