THE STATE, DEFENDANT IN ERROR, v. WILLIAM R. MAR-
TIN, PLAINTIFF IN ERROR.

Argued March 2, 1909—Decided June 14, 1909.

1. A person who maintains a place of business in which the law
   against usury is habitually violated is guilty of the offence of
   keeping a disorderly house.
2. Harmless error in an instruction to the jury affords no ground
   for a reversal.

On error to the Supreme Court, whose opinion is reported
in 47 *Vroom* 292.

For the plaintiff in error, *Gilbert Collins*.

For the state, *William J. Crossley,* prosecutor of the pleas,
and *William R. Piper,* assistant prosecutor.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE.   This writ of error brings up
for review a judgment of the Supreme Court affirming the
conviction of the defendant of the crime of keeping a disor-
derly house.   The gravamen of the offence charged against the
defendant is the habitual taking of usurious interest for loans
made by him at the office of the Capitol Loan Company in the
city of Trenton.   Both in the trial court and in the Supreme
Court it was contended on his behalf that the habitual taking
of usury does not make the place where such practice is car-
ried on a disorderly house.   The ruling upon this point was
adverse to the defendant in both courts, the precise question
having been previously so determined by the Supreme Court
in the case of *State* v. *Diamant,* 44 *Vroom* 131, and the first
assignment of error argued before us challenges the sound-
ness of that ruling.

What constitutes a disorderly house has been frequently
declared by the courts of this state.   In the case of *State* v.

*Williams,* 1 *Vroom* 102, it was defined by Chief Justice Whelpley, speaking for the Supreme Court, as "Any place of public resort, whether an inn, a dwelling-house, a storehouse, or any other building or garden in which illegal practices are habitually carried on." In *State* v. *Hall,* 3 *Id.* 158, Chief Justice Beasley, delivering the opinion of the same court, says: "In a legal point of view a house may be disorderly in two ways, viz., *first,* from the end or purpose to which it is appropriated, and *second,* from the mode in which it is kept. The end or purpose for which the house is designed will render the keeping of such house illegal, if it be such as, of necessity, *contravenes the provisions of any public statute."* In the case of *McClean* v. *State,* 20 *Id.* 471, the court adopted the definition of a disorderly house given in *State* v. *Williams, supra,* and declared that "Any place of public resort in which illegal practices are habitually carried on" is a disorderly house. This definition was again approved by this court in *Haring* v. *State,* 24 *Id.* 664. In the earlier case of *Meyer* v. *State,* 13 *Id.* 145, we declared that "A person who habitually keeps his house open * * * for a purpose which the statute interdicts," is guilty of the offence of keeping a disorderly house.

In view of this line of decisions it must be accepted as settled that any place in which illegal practices are habitually carried on is a disorderly house. The cases of State *v.* Hall and Meyer *v.* State would seem to have determined that practices which are prohibited by statute are illegal practices within the meaning of this definition. Counsel for the defendant now contends that the declaration of the two cases last referred to is broader than the decision of those cases required, and that it is only in cases where the habitual violation of a statute involves criminality or moral turpitude that a person is guilty of illegal practices within the meaning of that phrase as used in the case of State *v.* Williams and the other cases following it. He further contends that the taking of usury is not made unlawful by the statute of this state.

This latter contention may properly be considered, *first,* for, if it is sound, it is dispositive of the case now before us.

The title of our statute is "An act against usury." *Gen.
Stat., p.* 3703. The provision of its first section is "That no
person or corporation shall, upon contract, take directly or in-
directly, for loan of any money, wares, merchandise, goods and
chattels, above the value of six dollars for the forbearance of
one hundred dollars for a year, and after that rate for a greater
or less sum or for longer or shorter time." The object dis-
closed in the title of the act is the prevention of usury; the
method by which the legislature provides for the carrying of
that object into effect is by enacting an express prohibition
against taking it. Counsel argues that a violation of this
mandate of the statute by a person loaning money does not
constitute an unlawful act, *first,* for the reason that the statute
imposes no penalty upon him for so doing, and *second,* be-
cause there is nothing in the act which prohibits the borrower
from paying usury.

The statement that the statute does not impose any penalty
upon a person who takes usury is not accurate, for the second
section of the act deprives him of the power to enforce the
payment of any interest on his loan, and entitles the borrower
to have the amount of the usury deducted from the principal
of the loan in case usury has been paid. In this respect our
Usury act is quite similar to our act to prevent gaming (*Gen.
Stat., p.* 1606), the penalty imposed by which upon the suc-
cessful bettor is the return of the stake if it has been paid to
him. Each statute prevents the person who is benefited by
the violation of its provision from enjoying that benefit, and
nothing more. A violation of the act to prevent gaming has
been declared by this court, in *Haring* v. *State, supra,* to be
illegal, and a place where such violations are habitually in-
dulged in to be a disorderly house. We conclude, therefore,
that the fact that the statute imposes no penalty, except the
deprivation of the money which the statute prohibits the
lender from taking, affords no ground for holding that the
taking of usury is not unlawful.

Nor do we think the suggestion sound that the taking of
usury is not unlawful because the statute does not prohibit

the borrower from paying it. If it is, then the sale of liquor without a license is not unlawful, although prohibited by statute, for there is nothing in the statute which imposes any penalty on a person who purchases liquor from an unlicensed vendor, or which forbids anyone from so purchasing. The Gaming act, also, although it prohibits gambling, imposes no penalty on the loser.

We are clear that a violation of the law against usury is an unlawful act.

Is it necessary that the unlawful practices which are habitually indulged in must contain an element of criminality or of moral turpitude in order to render the place in which they are carried on a disorderly house? The sale of intoxicating liquor is not criminal *per se.* It is only made so by statute when the sale is unlicensed or occurs on Sunday, and not always then. See *Meyer* v. *State, supra.* Nor does it, in the eye of the state, involve moral turpitude, whatever opinion we, as individuals, may entertain upon the subject, for the state grants permission to selected persons to make such sales, and collects revenue for the permission, and the idea that the state, for motives of gain, is willing to become a party to an act which, in its judgment, involves moral turpitude, cannot be tolerated for a moment. And yet it is settled in this state that a house in which unlawful sales of liquor are habitually made is a nuisance, and he who maintains it is guilty of keeping a disorderly house. *Parker* v. *State,* 32 *Vroom* 308; *S. C. on error,* 33 *Id.* 801. The logical conclusion to be drawn from the case just cited, and those like it, as it seems to us, is that the declaration of Chief Justice Beasley in State *v.* Hall, and our own statement in Meyer *v.* State, that a place where practices which are interdicted by statute are habitually carried on is a disorderly house, is sound in its fullest extent.

We conclude, therefore, that a person who maintains a place of business in which the law against usury is habitually violated is guilty of the offence charged in the indictment now before us.

Counsel for the defendant further contends that the evidence submitted at the trial did not support the finding of the jury that the defendant habitually carried on the practice of taking usury at the office of the Capitol Loan Company, and that, therefore, the judgment against him should be reversed. This contention may be disposed of by saying that it is not justified by the fact; there is ample proof in the case to support the jury's conclusion upon this point.

The final assignment of error argued before us is directed at the charge of the court, and, in order that it may be appreciated, a brief reference to the facts is necessary. The defendant carried on business in the city of Trenton as the manager of the Capitol Loan Company. His method of transacting business was as follows: A person who desired to borrow, say $200, for a year, was required to obligate himself to pay $270 in twelve monthly installments of $22.50 each. Where the amount was less than $200 the excess required to be repaid was proportionately larger, increasing as the size of the loan diminished; the amount of the excess on a loan of $10, for instance, being $5.60. The method adopted by the defendant in making his loans was this: The borrower was told that the money advanced to him belonged to Clara H. Woodward, said to be a resident of a small town in the State of Illinois, and he was required to execute a chattel mortgage in her favor for the amount of the loan, with legal interest, and to pay for the drawing and recording of that instrument; he was further informed that the loan company was under obligation to guarantee to Mrs. Woodward the repayment of all of her moneys which it loaned, and he was required to give a second mortgage to the company for the remaining portion of the money which he agreed to pay at the end of the year, the excess over the principal and legal interest, as he was informed, being the company's charge for drawing the necessary papers and guaranteeing the loan and its commission for obtaining it. Both the defendant and one Weatherby, one of the company's managers, testified that this method was not a mere scheme adopted to evade the usury law, but that the

transactions were exactly what they were represented to be; that the money loaned was the money of Mrs. Woodward, and that she got for its use by the borrower only the legal rate of interest. The court, in charging the jury on this phase of the case, instructed them that if they found there was such a person as Mrs. Woodward, and that she was the lender of the money, and did not participate in the taking of the money charged for expenses incurred, and services rendered in making the loan, they must acquit the defendant; but that if they found that Mrs. Woodward was a myth, or a name put in the papers for the purpose of having some other person than the Capitol Loan Company appear as the lender, then it would be for them to say whether the making of a part of the papers in the name of Mrs. Woodward, and a part in the name of the loan company, was a mere device or scheme for exacting illegal rates of interest. The latter portion of this instruction was excepted to, and was assigned for error, both in the Supreme Court and here, the pith of the assignment being that there was nothing in the proofs which would justify the jury in finding that Clara H. Woodward was a myth, and that to permit them to do so was harmful to the defendant. The Supreme Court disposed of the assignment by saying "There was no evidence that Woodward was a myth, and if the judge had rested the case on that alone the charge could not be sustained. He did not rest it on that alone, but upon the question whether part of the papers were taken in her name, and part in the name of the Capitol Loan Company, as a mere device and scheme for exacting illegal rates of interest. We think the circumstances of the case justified this instruction."

We are inclined to think the statement of the Supreme Court that there was no evidence that Woodward was a myth is hardly justified. The only testimony that tended to show that she had any existence as a person connected with the transaction under investigation was that of the defendant and of Weatherby. The jury, by its finding, must be considered to have found these witnesses untruthful in their story with relation to the manner in which the loans were, in reality, made.

That there was abundant evidence to justify it in so doing we have already stated.  Having found that they had testified falsely upon this material part of the case, it was justified in disbelieving their statement that Clara H. Woodward was the person whose money was loaned.  It was not pretended that she had any other connection with the transactions, and the jury, if it did not believe that the money loaned was hers, was justified in finding—were compelled to find—that she was a mythical personage, so far as these transactions were concerned.  This, it seems to me, was all that the trial judge meant the jury was at liberty to find when he used the expression just criticised.  If we are wrong in so considering, and he meant that the jury might find that there was no such person in the whole world as Clara H. Woodward, then the instruction, to the extent that it went beyond a declaration that the jury might find she was a mythical person so far as any connection with the transactions under review was involved, was harmless; for, if they found she was a myth so far as the making of those loans was concerned, it was entirely immaterial whether such a person actually existed or not, and that fact could in no way have affected the decision of the case.

The judgment under review will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, REED, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, GRAY, DILL, J.J.   11.

*For reversal*—VROOM, J.   1.