Mary A. PAYNE, Appellant,

v.

UNITED STATES, Appellee.

No. 2756.

Municipal Court of Appeals for the District of Columbia.

Argued March 27, 1961.

Decided June 12, 1961.

Domenic Tesauro, Washington, D. C., with whom J. Leon Williams, Washington, D. C., was on the brief, for appellant.

Frank Q. Nebeker, Asst. U. S. Atty., Washington, D. C., with whom Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before HOOD and QUINN, Associate Judges, and CAYTON (Chief Judge, retired) sitting by designation under Code, § 11–776(b).

QUINN, Associate Judge.

The trial court, sitting without a jury, convicted appellant under an information charging her with maintaining a disorderly house from October 1959 to October 1960. Code 1951, § 22–2722. She appeals denying that the activity complained of established the offense alleged.

This conviction partially rested on government testimony disclosing that appellant had purchased stolen meat from one Turner Harris on numerous occasions beginning in the late spring or early summer of 1959. Harris' two sisters, confessing that they obtained the produce from local chain stores by shoplifting, stated that they had periodically accompanied Harris on visits to appellant's home where they witnessed the transactions, appellant customarily paying one-half of the retail price listed on each of the packages. They maintained that this course of dealing continued from September 1959 to April or May 1960 and mentioned three specific instances.

Attention then focused on another aspect of appellant's activity. A third government witness, also a sister of Harris, testified that in July 1959 appellant invited her over "to take care of some business" with a strange man, appellant arranging a rendezvous and allowing the parties to use a bedroom in her house for their illicit meeting. After finishing this "business" the witness said she went downstairs and asked appellant whether she wanted to share the proceeds. Appellant allegedly replied that she had already "been taken care of." In October 1960, shortly before appellant's arrest, the witness was present in the house when appellant sought to arrange another meeting for her. This effort failed, however, because appellant was unable to contact the prospective client.

While additional evidence was introduced against appellant, the above testimony formed the bulk of the government's case. We believe that it was enough and that the pattern of conduct described, taking place within appellant's home, is proscribed by our disorderly house statute.

Before turning directly to the scope of the statute in issue, it is possible that the evidence adduced would have supported a conviction for knowingly receiving stolen property, a violation of Code 1951, § 22–2205, conceivably on eight or nine counts for each of the separate instances recited at trial.[1] The fact that no evidence was produced affirmatively showing guilty knowledge would not prevent such a finding, for the trier of fact may properly infer the accused's knowledge of the goods' true character from the great disparity between the sale price and the price generally prevailing for similar or identical goods.[2] Additionally persuasive under the present circumstances is appellant's statement that Harris was pressed for money during the

---

1. The government explained during the course of the trial that it refrained from prosecuting appellant on this ground because proof of the identity and ownership of the stolen goods was lacking. However, the testimony of the two shoplifters established the origin and ownership of the meat. Though such uncorroborated testimony is normally of questionable reliability, it is sufficient, if believed, to warrant conviction. McQuaid v. United States, 91 U.S.App.D.C. 229, 198 F.2d 987, certiorari denied 1953, 344 U.S. 929, 73 S.Ct. 499, 97 L.Ed. 715.

2. United States v. Slaughter, 7 Cir., 1958, 255 F.2d 770; United States v. Kessler, 2 Cir., 1958, 253 F.2d 290.

period of these sales and was attempting to borrow from her. This being true, it appears unlikely, so it must have seemed to her, that he would or could absorb a financial loss by selling her meat for such a substantial discount—had it been legitimately acquired.

 Our statute relating to disorderly and bawdy houses does not define the behavior forbidden though it obviously encompasses certain well-known situations which we need not enumerate. However, adopting the common law definition which this court had occasion to indicate is "very broad,"[3] we believe it is accurate to say that "a disorderly house is one where acts are performed which tend to corrupt the morals of the community or to promote breaches of the peace."[4] The elements necessary in this jurisdiction have been set forth in the following language: "It is enough that the acts done are contrary to law and subversive of the public morals, that the house is commonly resorted to for the commission of such acts, and that the proprietor knows, or should in reason know, the fact, and either procures it to be done, connives at it, or does not prevent it."[5] The conduct need not disrupt peace and quiet or be open to public observation so long as it would be offensive to public sensibilities if its presence in the community were generally known.[6] This is the situation here. Consequently, it is correct to hold that the three separate unlawful acts of knowingly receiving stolen property, conducted in appellant's home, fall within the scope of the statute.

Nor was it error for the trial court to admit and consider evidence of criminal acts occurring prior to the time period specified in the information. The single act of prostitution and the other unlawful sales in the summer of 1959 were properly received to show that the later acts were a part of a continuing operation, and it is on this ground that the government introduced this evidence. This practice is too well settled to merit further elaboration.[7]

Affirmed.

3. United States v. Laffal, D.C.Mun.App. 1951, 83 A.2d 871, 872.

4. 3 Underhill, Criminal Evidence § 841, page 1884 (5th ed. 1957). Cf. Curley v. State, 1958, 215 Md. 382, 137 A.2d 640, and State v. Western Union Telegraph Co., 1951, 13 N.J.Super. 172, 80 A.2d 342, where the comparable state statutes are interpreted to apply to any house where acts prohibited by statute are regularly committed. Apparently the criminal acts need not affect the neighborhood or be morally unwholesome in order to constitute a violation.

5. De Forest v. United States, 1897, 11 App.D.C. 458, 463.

6. See quotation from King v. People, 83 N.Y. 587, in De Forest v. United States, supra, note 4.

7. See generally 1 Underhill, Criminal Evidence § 212 (5th ed. 1957).