David Gary HARRIS, Appellant,

v.

UNITED STATES, Appellee.

No. 6172.

District of Columbia Court of Appeals.

Reargued en banc April 30, 1973.

Decided Feb. 11, 1974.

Peter J. Levin, Washington, D. C., with whom Michael P. Goldenburg, Washington, D. C., was on the brief, for appellant. Robert A. W. Boraks, American Civil Liberties Union Fund, Washington, D. C., was also on the brief for appellant.

John C. Lenahan, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and John F. Finnegan, Asst. U. S. Attys. were on the brief, for appellee.

Before REILLY, Chief Judge, and KELLY, FICKLING, KERN, GALLAGHER, NEBEKER, PAIR, YEAGLEY and HARRIS, Associate Judges, sitting en banc.

KERN, Associate Judge:

Appellant was charged by an information with keeping a bawdy or disorderly house, specifically, "a premises resorted to for homosexual activities," in violation of D.C.Code 1973, § 22–2722.[1] At trial,[2] appellant's counsel in his opening statement conceded that appellant "owns and runs" the Regency Health Club, but asserted that it was a "homosexual health club," not a disorderly house. The government presented the testimony of an undercover police office as to what he had observed upon the five occasions he had visited the Regency which is located in downtown Washington.

The officer testified that

there was "nothing unusual about it [the Club] . . . [no] garish liights or music",

the "windows are painted over" and admission was by way of a metal door oper-

ated by a buzzer from inside the building to "members or persons who had sponsoring cards",

members were required to pay an initial fee of $15 and thereafter a $4 fee on each visit,[3]

the Club contained a number of "small booths, approximately four foot wide, eight or ten feet deep," in which there was a mattress and where he had seen and heard enough to suggest that homosexual activity was in progress,

the Club also contained lockers, a steam room, a "coke room" and a "therapy" room in which he had seen movies depicting homosexual acts and observed adult males commit acts of sodomy, and

anywhere from 15 to 40 persons had been present in the Club on the occasions he had visited and he himself had been invited by others on these occasions to engage in sodomy.

The trial court, among its other instructions, charged the jury:

[I]n order for you to find Mr. Harris guilty . . . you should, in accordance with the elements set forth by the D. C. Court of Appeals in the case of Payne v. United States . . . find . . . first:

That the acts . . . done on the premises are contrary to law *and subversive to the public morals*;

And secondly, that the premises are commonly resorted to for the commission of such acts. A single act violative of the law occurring on the premises does

---

1. The statute reads:
   Whoever is convicted of keeping a bawdy or disorderly house in the District shall be fined not more than $500 or imprisoned not more than one year, or both.

2. An earlier trial on this same charge resulted in a hung jury.

3. The officer initially obtained admission by presenting a sponsor's card and then filling out a membership application. He paid part of the membership fee then and the remainder on subsequent visits.

not make the premises a disorderly house;

And thirdly, that the proprietor . . . knows, or should in reason know that such acts are done and did not prevent them.

Those are the three elements of the crime charged of keeping a disorderly house. (Emphasis added.)

Appellant contends that our construction in Payne v. United States, D.C.Mun.App., 171 A.2d 509 (1961), of the disorderly house statute, *viz.*, there must be proof that acts done on the premises are *both* contrary to law *and* subversive of the public morals, has opened that statute to constitutional attack for vagueness since it is unclear which unlawful acts also subvert the public morals[4] and a defendant has a due process right to know beforehand what conduct of his is forbidden. Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

The government for its part questions our decision in *Payne* requiring it to prove in a disorderly house case that acts on the premises are not only unlawfully but *also* subversive of the public morals[5] and suggests (Memorandum at 6) "that frequent unlawful acts *without more* render a place where they are committed a disorderly house." (Emphasis added.) Faced with such searching questions of our *Payne* decision from both defense and prosecution and recognizing the difficulty faced by conscientious trial judges in applying *Payne*, as exemplified by the record in the instant case where the court took the utmost pains to follow as best it could what it deemed the controlling law,[6] we ordered this case reheard en banc to enable us to determine whether we should now modify or otherwise clarify *Payne*.

The crime of keeping a disorderly house was early recognized in this jurisdiction, United States v. Gray, 2 Cranch C.C. 675, 26 F.Cas. p. 17 (No. 15,251) (1826) ; United States v. Elder, 4 Cranch C.C. 507, 25 F. Cas. p. 996 (No. 15,039) (1835), and was expressly held by the Court of Appeals of the District of Columbia in Palmer v. Leno-

---

4. Mr. Justice Jackson, speaking for the Supreme Court in Musser v. Utah, 333 U.S. 95, 97, 68 S.Ct. 397, 398, 92 L.Ed. 562 (1948), which involved a defendant's challenge to a statutory prosecution for conspiracy "[t]o commit any act injurious . . . to public morals", observed:

In some States the phrase "injurious to public morals" would be likely to punish acts which it would not punish in others because of the varying policies on such matters as use of cigarettes or liquor and the permissibility of gambling. . . . Statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt. . . . Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused.

*See* Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 210–211, 414 F.2d 1097, 1106–1107 (1968). "Opposing segments of the general public may agree as to the immorality or profligateness of many activities. But . . . they will disagree on many others without approaching absurdity. Not

only does the phrase under scrutiny fail to chart for the individual citizen the course that is proscribed, but it also fails to mark out reasonably distinct boundaries for the judges, juries and police officers who are required to administer the law."

5. We note that the prosecutor at trial commented (R. at 77):

I don't feel that [under] present-day law —that the Government [must] prove immorality. That's an impossibility . . . .

. . . . .

The impact of that particular language [*Payne*] is devastating. . . .

6. The trial court during the course of giving its entire charge used the phrase "subversive to the public morals" on five occasions. The jury, after deliberating some three hours, requested a definition of "subversive" and a clarification of that part of the instruction derived by the judge from *Payne*. In response, the court read to the jury the dictionary meaning of "subversive", repeated that the acts done must be contrary to law *and* subversive of the public morals, and then stated:

I cannot elaborate on this statement. You must accept this law in reaching your verdict in the case.

vitz, 35 App.D.C. 303, 304 (1910), to be "a common-law offense" within the District of Columbia. Congress shortly thereafter enacted legislation similar in all substantive respects to the present statute intended to overcome the holding in *Palmer* (at 307), that the offense was "exclusively within the jurisdiction of the supreme court of the District". By such legislation the police court as well as the supreme court (the court of general trial jurisdiction at that time) was granted jurisdiction to hear and determine disorderly house cases. S.Rep. No. 430, 62d Cong., 2d Sess. (1912). Since Congress in enacting our disorderly house statute made no attempt to define what conduct it was seeking to proscribe we necessarily must resort to the common-law definition of the crime. United States v. Laffal, D.C.Mun.App., 83 A.2d 871, 872 (1951).

Our review of the treatises[7] and the decisions[8] persuades us that the common-law crime of keeping a disorderly house was the maintenance of premises upon which activity occurred that either created a public disturbance · or, although concealed from the public, constituted a nuisance *per se*,[9] such as a gambling house or bawdy house.[10] Indeed, as early as 1898 the Court of Appeals held in De Forest v. United States, 11 App.D.C. 458, 463, that those kinds of houses, such as gambling or bawdy houses, which are "generally sought to be surrounded with an air of mystery and secrecy to keep the knowledge of them from the general public" might nevertheless constitute disorderly houses. The rationale for this common-law rule rested upon the potential in these "houses" for breach of the peace that is inherently present in numbers of persons frequenting such places for unlawful purposes. De Forest v. United States, *supra*; Thatcher v. State, 48 Ark. 60, 2 S.W. 343 (1886) ; 2 F. Wharton, Criminal Law and Procedure § 763 (1957).

Our prior decisions have construed Section 22–2722 to apply to premises where the activities have *not* disturbed the public but have constituted a nuisance *per se:* a place where prostitutes picked up men, United States v. Laffal, *supra*; an apartment where a house of prostitution operated, Bennett v. United States, D.C.Mun. App., 171 A.2d 252 (1961) ; Packard v. United States, D.C.Mun.App., 77 A.3d 19 (1950) ; a hotel or tourist home where large numbers of men and women registered without baggage and left not long thereafter, Wood v. United States, D.C. Mun.App., 183 A.2d 563 (1962), cert. denied, 371 U.S. 963, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963) ; United States v. Basiliko, D.C.

---

7. 2 F. Wharton, Criminal Law and Procedure § 762 (1957) ; 3 W. Burdick, The Law of Crime § 907 (1946).

8. Commonwealth v. Ciccone, 85 Pa.Super. 316 (1925) ; Commonwealth v. Goodall, 165 Mass. 588, 43 N.E. 520 (1896) ; Price v. State, 96 Ala. 1, 11 So. 128 (1892) ; Thatcher v. State, 48 Ark. 60, 2 S.W. 343 (1886) ; Cheek v. Commonwealth, 79 Ky. 359 (1881) ; King v. People, 83 N.Y. 587 (1881) ; Lord v. State, 16 N.H. 325 (1844).

9. Nuisance *per se* is a term used in both civil and criminal law. It is defined as ". . . a structure or activity which is a nuisance at all times and under any circumstances. Proof of the act or the existence of the structure establishes the nuisance as a matter of law." Bader v. Iowa Metropolitan Sewer Co., 178 N.W.2d 305, 306–307 (Iowa 1970). *Accord*, Robichaux v. Huppenbauer, 258 La. 139, 245 So. 2d 385, 389 (1971), and 58 Am.Jur.2d, Nuisances § 12 (1971).

10. Several jurisdictions differ from this view and have adopted the position (1) that *only* premises where activities occur that actually breach the peace may constitute a disorderly house, Isaah v. State, 24 Okl.Cr. 174, 216 P. 950 (1923) ; State v. Calley, 104 N.C. 858, 10 S.E. 455 (1899) ; Mains v. State, 42 Ind. 327 (1873) ; or (2) that all premises upon which unlawful acts frequently occur, regardless of whether they create a public disturbance, constitute a disorderly house, Curley v. State, 215 Md. 382, 137 A.2d 640 (1958) ; State v. Martin, 77 N.J.L. 652, 73 A. 548 (1909). These decisions are at odds with the majority of decisions.

Mun.App., 35 A.2d 185 (1943); and, a hotel frequented by prostitutes with their "dates", Collins v. United States, D.C.Mun.App., 41 A.2d 515 (1945).

■ In *Payne*, however, we departed from the mainstream of the common law that for a disorderly house to exist there must be a public disturbance or a nuisance *per se* consisting of a gambling house or bawdy house and upheld in that case a conviction upon evidence only that the defendant regularly and knowingly purchased stolen goods in her home. In *Payne*, we also appear to have concluded from a reading of certain language contained in *De Forest* [11] that a disorderly house prosecution lies where acts done on the premises are contrary to law *and* subversive of the public morals. We conclude upon a further review of *De Forest* and consideration of the common-law definition of the offense of keeping a disorderly house adopted and followed in most jurisdictions, including the District, that subversion of the public morals is *not* an element of proof of that crime. Rather, the concern for the public's morals (as well as its health and safety) was the *reason* at common law why

an establishment constituting a nuisance, *viz.*, a gambling house or bawdy house, although kept secret from the general public, nevertheless was deemed a disorderly house. *See, e. g.,* Price v. State, 96 Ala. 1, 11 So. 128 (1892); Thatcher v. State, *supra,* and Cheek v. Commonwealth, *supra.* We conclude that the government in a disorderly house prosecution must prove that the activities on the premises either disturb the public or constitute a nuisance *per se*.[12] Accordingly, we find it unnecessary to reach the constitutional vagueness issue posed by appellant because of our conclusion that *Payne* was incorrect in requiring proof by the government that the defendant subverted the public morals.

We are then met with the issue of whether the Regency Health Club, a "homosexual health club" where acts of sodomy took place, is similar enough to a gambling house or a bawdy house so as to be a nuisance *per se*. Initially, we note, that Congress in D.C.Code 1973, § 22–2713, has expressly declared the maintenance of an establishment for the purpose of "lewdness, assignation or prostitution" to be a nuisance and has provided a series of mea-

11. "The keeping of a common bawdy or gambling house constitutes the house so kept a disorderly house and an indictable nuisance at common law. . . . It is a public offense for the *reason* that its direct tendency is to debauch and corrupt the public morals, to encourage idle and dissolute habits, and to disturb the public peace. . . ."

. . . It is enough that the acts done are contrary to law and subversive of the public morals, that the house is commonly resorted to for the commission of such acts, and that the proprietor knows, or should in reason know, the fact, and either procures it to be done, connives at it, or does not prevent it. . . . (Emphasis added.) [De Forest v. United States, *supra,* 11 App.D.C. 458 at 462–463.]

12. Appellant claims it is inconsistent to reject "subversive of the public morals" as an element of the offense while allowing conviction without proof of public disturbance. This

inconsistency arises, he says, because without public disturbance certain establishments are considered disorderly houses only because of their immoral character—an unconstitutionally vague standard.

We believe this argument misconceives the nature of a vagueness attack on a statute. A vague statute fails to meet minimum due process requirements because its wording does not give fair notice of the acts prohibited. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). For this reason "subversive of the public morals" is subject to criticism when used in the definition of an offense. However, concern for the "public morals" is a legislative consideration that may lead to a valid proscription of certain activities—so long as they are delineated in language clear enough to give notice of what is included. We believe the common-law definition of keeping a disorderly house, which we adopt, meets the requirement of giving clear notice.

sures for its abatement, D.C.Code 1973, §§ 22–2714 to 22–2719.[13]

This legislative declaration is sufficient to indicate that establishments other than bawdy houses may constitute a nuisance *per se*. We have recently interpreted the term "lewdness" used in a statute prohibiting solicitation as referring to unlawful sexual conduct, *viz.*, sodomy. *See* Riley v. United States, D.C.App., 298 A.2d 228; 230–231 (1972), cert. denied, 414 U.S. 840, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973). Other jurisdictions have construed the term "lewdness", when used in conjunction with words proscribing a bawdy house, to include acts of sodomy. *See* People v. Lackaye, 348 Ill.App. 542, 109 N.E.2d 390 (1952), aff'd, 1 Ill.2d 618, 116 N.E.2d 359 (1954) (statute proscribing the keeping of a place for "the practice of prostitution or lewdness") and Commonwealth v. Porter, 237 Mass. 1, 129 N.E. 298 (1921) (statute proscribing a place "used for prostitution, assignation or lewdness").

■ When we focus on the activities done on the premises of the Regency Health Club and the circumstances surrounding its operation, as set forth in detail above, we are of opinion that these are sufficiently analogous to the operation of a bawdy house to constitute the Regency a nuisance *per se*. Both contain the same potential for public disturbance by bringing together groups of people who engage in acts violative of laws dealing with sexual conduct, *viz.*, prostitution and sodomy, and both are dangerous because they facilitate the violation of law. *Compare* the reasoning here with Commonwealth v. Hartung,

156 Pa.Super. 176, 39 A.2d 734 (1944), and Cheek v. Commonwealth, *supra*.

■ Appellant contends that acts done at the Regency could *not* violate the law because the statutory proscription against sodomy, D.C.Code 1973, § 22–3502, is unconstitutional. · Specifically, he argues that the sodomy statute reaches in this case conduct which is protected by the right of privacy recently recognized by the Supreme Court.[14] But, the acts of sodomy here occurred not in a private abode but on the premises of a commercial establishment open to the public,[15] and are therefore not protected by any recognized right to privacy. *See* Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L. Ed.2d 446 (1973). ("[I]t is unavailing to compare a theater, open to the public for a fee, with the private home of Stanley v. Georgia . . . and the marital bedroom of Griswold v. Connecticut . . . . This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing.") *See* Lovisi v. Slayton, 363 F.Supp. 620 (E. D.Va.1973).

■ Failing this argument in justifying the lawfulness of the conduct at the Regency, appellant says that since the sodomy statute is broad enough to be applied to conduct within a private abode between those in a familial relationship who might arguably be entitled to protection from state intervention under the so-called "right to privacy decisions" of the Supreme Court, he himself may assert in this

---

13. According to the Committee report, the object of the particular legislation was to suppress public prostitution "by means of injunction". However, the Report states that any building maintained for purposes of lewdness, assignation or prostitution "is declared to be a nuisance". S.Rep.No.190, 63d Cong., 2d Sess. (1914).

14. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of a woman to

terminate her pregnancy); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (right to possess and show obscene materials in the privacy of one's home); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right to use contraceptives in privacy of marital bedroom).

15. Membership in the Regency could be obtained by the public with minimum formality and modest fees.

case on behalf of those others the over-breadth of D.C.Code 1973, § 22–3502. Accordingly, he urges us to declare the sodomy statute void on its face with the result that the activities at the Regency, in the absence of a valid proscription against sodomy, would be lawful.

Whatever may be the applicability of the right of privacy decisions to a homosexual act committed by two consenting adults in private, an issue which we expressly do not reach, the Supreme Court has not allowed persons to challenge the constitutionality of statutes when their own conduct could be permissibly burdened by them except under limited circumstances. *See* United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

The Court has applied the "overbreadth doctrine" in the First Amendment area when the challenged law has a "chilling effect" on constitutionally preferred liberties. Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). We are cited to no decisions, however, which void statutes on their face for the inhibiting effect they allegedly might have on an argued right to privacy when the party raising the challenge to the statute was not himself within the class of persons whose right of privacy was affected by the application of that statute.[16] *See* Lovisi v. Slayton, *supra*, 363 F.Supp. at 627–628.

Appellant, therefore, lacks standing to raise the potential overbreadth of D.C. Code 1973, § 22–3502.

■ In summary, to constitute the offense of keeping a bawdy or disorderly house under D.C.Code 1973, § 22–2722, the government must prove that acts take place on the premises that disturb the public or constitute a nuisance *per se* in the nature of a gambling house or bawdy house; that the premises are regularly resorted to for the commission of these acts; and, that the proprietor knows or should know of the acts and does nothing to prevent them. Since the conduct on appellant's premises which is the subject of the charge against him occurred prior to our decision today in which we render authoritative construction of Section 22–2722 and reject our earlier *Payne* decision, we conclude that the judgment of conviction entered in this case must be reversed and the case remanded for the entry of a judgment of acquittal. *See* Bouie v. City of Columbia, 378 U.S. 347, 352–353, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); District of Columbia v. Edgcomb, D.C.App., 305 A.2d 506, 512 (1973).

Reversed.

## SEPARATE STATEMENT BY NEBEKER, Associate Judge:

In my earlier opinion, wherein Chief Judge Reilly and I affirmed the conviction, we found it unnecessary to treat the "public morals" point so ably argued by counsel. Indeed, it was our duty as a three-

---

16. In Griswold v. Connecticut, *supra*, a statute forbidding the use of contraceptives (rather than regulating their manufacture or sale) *was* struck down for constitutional overbreadth but the statute had been applied to an accessory who the Court recognized was sufficiently identified with the principal to be considered within the class of persons affected.

One commentator has noted guidelines for overbreadth scrutiny by courts. Among the factors to be considered, he suggests, are (1) the degree of overbreadth—a law ought not be struck down unless it lends itself to a substantial number of impermissible applications

—and (2) the area of impact—the area affected by the challenged law must *substantially* involve First Amendment interests. *Note*, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 858–62 (1970). The so-called right to privacy decisions by the Supreme Court rest not upon the First Amendment *alone* but upon a penumbra of rights derived from *various* constitutional amendments. Furthermore, to strike down the law might do substantial harm to the legitimate governmental interest in preventing forcible sodomy. *See, e. g.*, Brinson v. State, 278 So.2d 317 (Fla.Dist.Ct.App.1973).

judge division to avoid the constitutional issue if possible and to avoid departing from the *Payne* decision. M. A. P. v. Ryan, D.C.App., 285 A.2d 310 (1971). That is why I could not subscribe to Judge Kern's very able concurring opinion.

I continue to be of the view that "Congress . . . has left to the bawdy house provision the proscription of keeping a house for homosexual prostitution".

(Original division opinion, 293 A.2d at 854.) That was the limited nature of the majority holding. Our en banc decision today is not inconsistent with that view, but instead adopts the more general rule of known acts amounting to nuisance *per se*. It is this new interpretation of *Payne* which all members on the original division were precluded from adopting under the stricture of M. A. P. v. Ryan, *supra*.