THOMAS CIRCLE LIMITED
PARTNERSHIP, Appellant,

v.

UNITED STATES, Appellee.

No. 11568.

District of Columbia Court of Appeals.

Argued Feb. 15, 1977.

Decided April 12, 1977.

Leonard C. Collins, Washington, D. C., with whom Michael E. Brand, Washington, D. C., was on the brief, for appellant.

Mary Ellen Abrecht, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Paul Hoffman, and Gordon C. Rhea, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before YEAGLEY and HARRIS, Associate Judges, and PAIR, Associate Judge, Retired.

PAIR, Associate Judge, Retired:

On July 30, 1976, James Norris, the resident manager of a building located at 1402 M Street, N.W., was found guilty of operating a bawdy house.[1] Determining that such use of the building was a public nuisance, the trial court entered pursuant to D.C. Code 1973, § 22–2717, an order of abatement effective August 6, 1976.[2] The own-

1. D.C.Code 1973, § 22–2722, provides:
   Whoever is convicted of keeping a bawdy or disorderly house in the District shall be fined not more than $500 or imprisoned not more than one year, or both.

2. D.C.Code 1973, § 22–2713, provides:
   Whoever shall erect, establish, continue, maintain, use, own, occupy, or release any building, erection or place used for the pur-

pose of lewdness, assignation, or prostitution in the District of Columbia is guilty of a nuisance, and the building, erection, or place, or the ground itself in or upon which such lewdness, assignation, or prostitution is conducted, permitted, or carried on, continued or exists . . . shall be enjoined and abated as hereinafter provided.

ers of the building were not parties in the criminal proceedings but after the entry of the order of abatement, they moved the trial court to set aside the order urging that they had not participated in the unlawful use of the building and were not informed of such unlawful use.

As further support for their motion, the owners produced a new proposed lease of the building to become effective upon vacation of the order of abatement. Under the provisions of the proposed lease, the Volunteers of America, a religious charitable organization, would take over the building. The owners represented to the court that the building would be partially remodeled for use as a community treatment home for male alcoholics. The trial court denied the requested relief.[3]

Appellants now contend that the trial court erred in issuing the order of abatement since there had been no judicial determination that they either knew of the illegal use to which the property would be put when they leased it, or that they condoned such use when they learned of it. We reject these contentions and sustain the order of abatement.

The building in question was leased by appellants through a rental agency to a Mr. Adolphus Payton who, in turn, hired Norris as resident manager. According to the terms of the lease, the building was to be used as a "gift shop and living quarters."

After numerous complaints by neighbors and extensive police surveillance, Norris was arrested in March of 1976 and charged with operating a house of prostitution. Notwithstanding his arrest, the illegal activities continued and Norris was arrested again on the same charge in June of 1976.

The abatement of nuisances is controlled by D.C.Code 1973, § 22–2717, which provides in part:

> If the existence of a nuisance be established in an action as provided in sections 22–2713 to 22–2720, or in a criminal pro-

ceeding, an order of abatement shall be entered as a part of the judgment in the case which order shall direct the . . . effectual closing of the building or place against its use for any purpose, and so keep it closed for a period of one year, unless sooner released.

■ It is well settled in this jurisdiction that the operation of a bawdy house constitutes a nuisance per se. *Raleigh v. United States,* D.C.App., 351 A.2d 510, 514 (1976); *Harris v. United States,* D.C.App., 315 A.2d 569, 572 (1974). It is also well settled that when found to exist, such a nuisance must be abated. *Raleigh v. United States, supra* at 514; *Graul v. United States,* 47 App.D.C. 543 (1918). *See also Heyne v. Loges,* 68 Ariz. 310, 313, 205 P.2d 586, 588 (1949).

■ Notwithstanding this imperative authority, appellants contend that the order of abatement in the instant case should not have been issued because they, as owners of the property, lacked "guilty knowledge" of its illegal use. In support of this contention, appellants rely heavily on *Holmes v. United States,* 50 App.D.C. 147, 269 F. 489 (1920). We find reliance on this case to be misplaced.

Involved in *Holmes* was a hotel in the District of Columbia where repeated acts of prostitution had occurred. Finding that such use of the hotel constituted a nuisance, the court issued an order of abatement. On appeal, the order was reversed, the court noting the absence of any allegation or proof that the owner or his lessee had guilty knowledge of the acts of prostitution. The court observed that the major use of the building as a hotel was a legitimate use; and that the acts of prostitution were described as sporadic. The court then said:

> If the act in question [requiring abatement of nuisances] is susceptible of such a construction, then every hotel and apartment house in Washington is liable to be closed for a year, if it is made to

---

**3.** As permitted by D.C.Code 1973, § 22–2718, appellants could have obtained the cancellation of the order of abatement by posting a bond in the amount of the full value of the property

conditioned on the immediate abatement of the nuisance and the prevention of any recurrence, during the period of one year, of the activity complained of.

appear that sporadic acts of lewdness and prostitution occurred therein . . . without the knowledge of either the owner or lessee. [*Id.* at 149, 269 F. at 491.]

In the instant case, involvement of the lessee was conceded. It appears from the record that the acts of prostitution here were anything but sporadic—they were open, obvious, notorious, and continuing.[4]

Appellants concede that they eventually learned how their property was being used. However, it is clear from the record that one of appellants' agents visited the premises often throughout the term of the lease to collect rent and to deal with neighborhood complaints regarding the crowds that often congregated in front of the building. Furthermore, unlike the hotel in *Holmes,* the building in the instant case served no legitimate purpose, certainly not that of a "gift shop and residence" as provided for in the lease. In view of the foregoing, and the earlier arrest of Norris, it can be inferred that appellants should have known early in the lease's term that their property was being used for illegal purposes. *Killeen v. United States,* D.C.App., 224 A.2d 302, 304 (1966); *Payne v. United States,* D.C.Mun. App., 171 A.2d 509, 510 (1961). Despite this actual or constructive knowledge, no timely steps were taken to end the tenancy or to control the use of the property. It has been noted in a similar context that:

> Ownership carries its duties as well as its benefits. One of them is to keep the property from a use which is unlawful. It is imposed upon the owner because that is where it ought to rest. It is an element of his right of control over the property; his authority to direct the purposes for which it may be used. [*Moore v. State,* 107 Tex. 490, 496, 181 S.W. 438, 440 (1915), *cited in State v. Guardian Realty,* 186 So. 168, 171 (Ala.1939).]

We conclude therefore that after the unlawful use was found to be a nuisance per se, the trial court did not err in issuing the order of abatement. The purpose of that order was, of course, not to punish appellants, but rather to rid the community of a nuisance. *Graul v. United States, supra; compare Hill v. United States,* 59 App.D.C. 381, 44 F.2d 889 (1930); *see Heyne v. Loges, supra,* at 312, 205 P.2d at 587.

*Affirmed.*

---

4. One witness testified that she had seen as many as 2,000 couples enter the building and leave within a short period. Another witness testified that she observed women approaching men on the street before escorting them into the building. Other witnesses testified as to the widespread reputation of the building as a "trick pad".