CURLEY *v.* STATE

[No. 129, September Term, 1957.]

*Decided January 22, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

Submitted on brief by *Daniel M. Murray, Jr.,* and *James G. Boss* for appellant.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *C. Orman Manahan, State's Attorney for Howard County,* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

Robert Hugh Curley has appealed from the judgment and sentence of the Circuit Court for Howard County entered on May 2, 1957, upon a verdict of guilty on all counts under an indictment charging in four counts violations of the gambling laws by making and selling a book and pool on the result of horse races, and charging in one count the unlawful receiving of money to be bet on horse races (Art. 27, sec. 306 (Code 1951)); and from the judgment and sentence upon a verdict of guilty under an indictment charging the maintenance of a disorderly house. The two cases were tried together before the court, sitting without a jury.

The single question involved on this appeal is whether the evidence was sufficient in law to sustain the convictions, or were the verdicts of the trial court clearly erroneous.

Acting upon the request of the State's Attorney for Howard County, Policewomen LaPlante and Brethauer, members of the Rackets Division of the Baltimore City Police Department, were assigned to investigate the activities of the appellant at a diner and cocktail lounge known as the Outriders'

Diner, located on the Washington Boulevard in Howard County. The policewomen began their investigation on October 17, 1956, and subsequently observed the appellant in the diner on October 19, 20, 23, 1956. On all these dates races were being run at "Marlboro" (Upper Marlboro).

The Outriders' Diner was described as consisting of a cocktail lounge and bar in one part, with a diner portion adjoining. To the rear of the cocktail lounge and bar was a passageway which led to a ladies' room, a men's room and a room marked "Private." The door to this room was sometimes open, and at other times closed, but apparently not locked. Many people were present at all times, to whom meals and drinks were served. The place was frequented primarily by persons interested in, or associated with, horses, races and race tracks; and these subjects were the main topic of conversation in the establishment.

On the morning of October 17, 1956, at approximately 11:45 a.m., the policewomen arrived at the Outriders' Diner and took a seat in the cocktail lounge. At that time the appellant was present, and they observed him "run and answer" the telephone whenever it rang in the cocktail lounge or the diner. He seemed to be the only one receiving any telephone calls. Whenever he went to answer the telephone, he carried a scratch sheet in his hand and would take it with him into the telephone booth. He was observed sitting down in the booth and writing after each call. The policewomen testified that he was called to the telephone eight or ten times while they observed him from 11:45 a.m. until approximately 1:10 p.m. They also observed that Curley put the papers on which he was writing in his pocket, and that they were of various shapes, sizes, forms and colors. One of the policewomen observed that he had sorted through the slips and took money out of his pocket and counted it. She overheard a man say to him, "Where are the slips?" and the appellant nodded toward a doorway leading to the backroom, the door of which was marked "Private."

On the following day of investigation, October 19, 1956, the policewomen arrived at the premises at approximately 11:00 a.m. and stayed until approximately 1:50 p.m. Again,

Curley constantly answered the telephone and took his scratch sheet with him. When he came out of the telephone booth, he folded the slips upon which he had written with a group of other slips and put them in his "pants'" pocket. On this occasion both of the policewomen overheard an old man at the bar tell the appellant, "Put two on ........ in the sixth" (neither of the witnesses could make out the name of the horse). At that time the witnesses observed money being passed, namely, two one-dollar bills, from the old man to Curley. At the same time, Curley was writing on a slip of paper. After he had written on the slip of paper, he took the same and went into the back room which was marked "Private."

The third investigation was conducted on October 20, 1956, the policewomen arriving at 11:50 a.m. At approximately noon, a well-dressed man came into the diner and the policewomen observed Curley give him some money, and the following conversation was overheard, the man saying: "That's all right about the change," and Curley said: "No, you get all that's coming to you." On the same day, Curley received about six telephone calls, and he was observed sitting down and writing during each one of these calls. On one occasion when he came out of the booth, after having talked on the telephone, he sat at a table, took a number of slips from his pocket, sorted them and spread them out on the table. After making some notations on them, he put them back in his pocket. The roll contained, in the estimation of one of the policewomen, approximately one dozen slips and made a roll between one-quarter and one-half an inch in thickness.

The fourth day of the investigation was October 23, 1956, the policewomen arriving at approximately 11:00 a.m. and remaining until 12:15 p.m. On that date the appellant answered the telephone approximately three times, and on each occasion had a scratch sheet in his hand. On one of these occasions he was heard to say: "What have you got and what do you want?" On this day a heavy-set man came into the cocktail lounge and went into the back room with Curley. The policewomen observed Curley throw some money towards him. Upon a signal given by the police-

women, the premises were raided by a group of policemen commanded by Sergeant Smith of the State Police.

Sergeant Smith arrested Curley as he walked out of the diner and searched him as well as the back room of the premises. Sergeant Smith found $121.00 in cash, three slips of paper with a printed heading "Blucher & Mills, Inc., Automobile & Truck Repairing, 313 First Street, Laurel, Maryland. Parkway 5-3440." Also found on Curley's person was one Armstrong Daily Scratch Sheet for the current day, and one small note book together with a short lead pencil. Sergeant Smith searched the premises, particularly the back room marked "Private." He found a pad which contained slips of paper with the "Blucher & Mills" heading, which paper was not written on, but the top slip contained indentations indicating that someone had written on slips that had been removed. The impressions clearly showed the names of horses which had run on Maryland tracks. The Sergeant found the name "Ida K" visible to his eye, the same being the name of a horse which had run on a previous day at Marlboro. These indentations were photographed by the Photographic Laboratories of the State Police, and from the photographs it was determined that the indentations contained the names "Ida K" and "Scepter," together with the letters "DD." These two horses ran, respectively, in the first and second races at Marlboro on the previous day, October 22, and Sergeant Smith testified that the letters "DD" indicated "Daily Double."

In the raiding party was Corporal Dashield of the Maryland State Police who was assigned to answer the telephone on the premises with the number Parkway 5-9883. Corporal Dashield, while answering the telephone, received one call, the calling party purporting to call the appellant, and the conversation, as related by the corporal, indicated that a bet was intended to be placed. No testimony was offered on behalf of the appellant.

It is the position of the appellant that his activities as shown by the evidence are as equally consistent with innocence as with guilt, and, therefore, the proof does not meet the test to justify a verdict of guilty that the circumstances,

when taken together, must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence. This identical argument was made in the motion for reargument in *Edwards v. State*, 198 Md. 132, 81 A. 2d 631, 83 A. 2d 578. At page 157, this Court stated:

"If we assume that circumstantial evidence, or all the evidence of any kind, must 'exclude to a moral certainty every other reasonable hypothesis than that of guilt', this assumption does not change the result in the instant case—and does not furnish any 'definite rule for the appraisal of circumstantial evidence'. In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved. In a civil case the fact must be shown, or the inference supported, by a preponderance of probability or an opposite preponderance must be overcome. In a criminal case the fact must be shown, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. The difference in degree of proof is ordinarily for the triers of facts.

\* \* \*

"Counsel ask how we could ever say that the trial court is clearly wrong. This question can only be answered as and when it is presented, case by case. If we recognize the difference between the roles of triers of facts and appellate courts, and the terms of Rule 7, (now 741 c) it is to be expected that such cases will be rare, \* \* \*."

When reviewing a judgment or sentence of the trial court, sitting without a jury in a criminal proceeding, our only duty is to determine whether there was evidence, or proper inferences from evidence, upon which the trial court could properly find the defendant guilty. *Jenkins v. State*, 215 Md. 70, 137 A. 2d 115. Maryland Rule 741 c.

## I

We think there was ample evidence, with the proper inferences from that evidence, to sustain both convictions. We shall first consider the violations of Art. 27, section 306. The trial court stated that he thought it was the "accumulation of all the activities as testified to" that led him "to the conclusion that it couldn't be anything else but bookmaking." We believe the evidence justified his arriving at this conclusion. The setting of the appellant's activities described in the evidence, his apparently daily attendance at the Outriders' Diner, his habitual and prompt answering of the telephone and making memoranda while using the same, his conversations with, and transfers of money to, other persons, the indentations of horses' names found upon the paper (with the same heading as paper taken from the appellant's person) in the room in which he was frequently seen, the money and slips found upon his person, and the telephone call that was taken by the police officer, wherein the caller said "Hello, Curley" and then placed a bet, are, when considered together, sufficient to sustain findings of convictions by the trial judge for violations of sec. 306 of Art. 27 as charged in the first indictment.

## II

As stated at the beginning, the appellant was also found guilty of keeping and maintaining a disorderly house. The accusation was based solely upon his activities at the Outriders' Diner, which have been described above. There was no testimony that he had any ownership in, or actively participated in the management of, the Outriders' Diner. It therefore becomes necessary to determine whether, under the circumstances, the trial court was justified in finding him guilty of "keeping and maintaining" a disorderly house. In this regard we must determine (a) whether the appellant "kept and maintained" the place alleged to be a disorderly house, and (b) whether the activities carried on therein were such as to constitute it a disorderly house.

### (a)

A house may be disorderly either from the purpose for

which it is appropriated, or from the mode in which it is kept. The charge does not respect ownership or proprietorship, but the conduct of the place. "House" means an edifice, apartment or place. It includes, among other places, a room, a place of business, a tent, a wagon or a boat. *Hochheimer, Criminal Law,* (2d Ed.), sec. 309. It was held in *Meinert v. State* (Ind.), 131 N. E. 515, that a prisoner in jail having authority over other prisoners in the room where he was confined, who furnished cards and supervised games of chance, and took a "rake-off" on each "pot" for the privilege of playing in the room, violated a statute against "keeping" a room to be used for gaming. In *People v. Bell,* 212 Ill. App. 144, the testimony showed that the defendant was frequently seen in a room back of a saloon engaged in running a crap game. There was no evidence as· to who was the owner or lessee of the room. The court held that the jury was fully warranted in finding the defendant guilty of "keeping" a gaming house. See also *State v. M'Gregor,* 41 N. H. 407. Cf. *Keife v. State* (Ala. App.), 70 So. 950. We hold that the facts of the present case fully support a finding that the appellant was "keeping and maintaining" the place where his activities were carried on though he had no ownership in, nor exercised any active participation in the management of, the usual business conducted by the Outriders' Diner.

### (b)

There only remains for determination the question of whether the conduct and actions of the appellant at the Outriders' Diner were such as to warrant a finding that the establishment, as being run, was a "disorderly" house. A house is disorderly if kept as a place where acts prohibited by statute are habitually indulged in or permitted. *State v. Martin* (N. J.), 73 A. 548, 549; 17 *Am. Jur., Disorderly Houses,* sec. 2; *Hochheimer, op. cit.,* sec. 309. The betting, or wagering, of money on horse races was not a violation of the common law, *James v. State,* 63 Md. 242; but it has been made a violation of the law, under certain circumstances, by statute. As we held above that the State's evidence justified a finding that the appellant violated the statute many times

on the days charged in the one indictment, and that he was "keeping and maintaining" the place in the eyes of the law, and we have shown that such a place is "disorderly" when acts prohibited by statute are habitually indulged in or permitted, it follows, as an illative consequence, that the trial judge was warranted in finding the appellant guilty of keeping and maintaining a disorderly house, under the other indictment.

*Judgments and sentences affirmed, with costs.*