739 A.2d 80

**Sheldon Gary McNEIL**

v.

**STATE of Maryland.**

**No. 131, Sept. Term, 1998.**

Court of Appeals of Maryland.

Oct. 19, 1999.

John L. Kopolow, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Ann N. Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

Petitioner, Sheldon McNeil, was convicted by a jury in the Circuit Court for Anne Arundel County of first degree rape, first degree sexual offense, kidnapping, and a number of lesser included offenses. He was given concurrent life sentences for

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

the rape and sexual offense and a consecutive ten-year sentence for the kidnapping. The offenses arose from an encounter with a 17–year–old drug-addicted prostitute on the afternoon of May 17, 1996.

We are not concerned here, directly, with the facts underlying the offenses committed against the instant victim. It will suffice to say that on ample evidence, the sufficiency of which is not challenged, the jury necessarily concluded that McNeil came across the victim in Baltimore City, forced her into his car at the point of a knife, drove her into Anne Arundel County against her will, took her into a wooded area, forced her at knifepoint to commit fellatio, raped her, and then abandoned her.

The issues before us arise not from what happened to the victim but from McNeil's attempt two months later to engage an undercover Baltimore City police officer, posing as a prostitute in a sting operation, in certain sexual activity. Evidence obtained indirectly as a result of his arrest for that endeavor was used against him in the instant prosecution. The two issues presented to us, emanating from his unsuccessful effort to suppress that evidence, are (1) whether his conduct with respect to the undercover officer amounts to a crime under Maryland Code, Article 27, § 15(e), and (2) even if it does, whether there was probable cause for his arrest. We shall answer both questions in the affirmative and affirm the judgment entered below.

## BACKGROUND

As noted, the offenses against the victim were committed on May 17, 1996. On June 20, a similar attack was reported against another young prostitute. The descriptions given by the two victims of the assailant, his conduct, and his car were similar. The police were thus looking for a white male with a heavy build, brown hair, and a mustache, driving a blue Toyota with a radio installed upside down—the volume knob being on the right side—and with tears in the interior roof lining, who preyed on young prostitutes. Both encounters began in Baltimore City and ended up in the same wooded

area of Anne Arundel County. Sergeant Clark, of the Anne Arundel County Police Department, prepared a flyer and made contact with the Baltimore City police. He was informed that the City police were going to implement a major prostitution sting operation on July 9, and he was invited to observe.

The operation involved several undercover police officers posing as prostitutes and "johns"—potential customers. The officers were looking to arrest both real prostitutes and real customers. The immediate cause of McNeil's grief was Officer Bernadette Giblin, posing as one of the prostitutes. Dressed for the occasion, Officer Giblin was pacing the 1800 block of McHenry Street (where the second victim had been abducted) when McNeil, driving a blue Toyota with a torn roof lining and a radio having its volume knob on the right, stopped, made eye contact with her, and gestured for her to approach the driver's side of his car. When she came over, he asked if she "was working," which the officer understood to mean working as a prostitute. She responded that she was, and he asked her to get in the car. She agreed but first asked what he was "looking for." He responded "half and half," which, based on her training and her experience in this kind of operation, she took to mean half sexual intercourse and half fellatio. As she walked around the car to the passenger's side, she signaled the arrest team, and McNeil was arrested and taken to the police station.

Sergeant Clark, waiting at the station, was allowed to interview McNeil. At some point, the sergeant took McNeil to a police station in Anne Arundel County and questioned him about the two rapes. McNeil denied any involvement and specifically denied having sex with anyone on May 17. He was photographed and, upon his written consent, was taken to a local hospital for hair, blood, and saliva testing. He was then driven to what he said was his cousin's home, where he wanted to go, and was released. McNeil does not contend that he was still under arrest after he left the City police station; it appears that he voluntarily accompanied Clark upon his release from custody in Baltimore City. A few days

later, the instant victim identified McNeil from the photograph taken by Sergeant Clark, and, with that evidence, McNeil was eventually arrested. A later search of his apartment, pursuant to a search warrant, turned up a knife which the victim identified as the one used by her assailant. Tests conducted on the hair, blood, and saliva samples taken from him were also used at trial as identification evidence, as was the photograph.[1] The victim made a positive courtroom identification as well.

McNeil's motion to suppress was very broad and devoid of details. He apparently meant it to encompass all evidence obtained by Sergeant Clark—from his observation of the blue Toyota, from the search of that car and McNeil's apartment, from the forensic tests, and from any statements given by McNeil—on the theory that all of that evidence emanated from his unlawful arrest by Officer Giblin. The State seems to accept that premise. It makes no argument that any of that evidence would survive suppression if the arrest was, indeed, unlawful, and we shall therefore proceed on that assumption.

## DISCUSSION

### Introduction

Article 27, § 15 creates seven offenses against public morality:

(a) to keep up, maintain, or operate any place, structure, building, or conveyance for the purpose of prostitution, lewdness, or assignation;

(b) to occupy any such place[2] for the purpose of prostitution, lewdness, or assignation or to permit any such place to be

---

1. McNeil suggested in the trial court that his consent to the testing of his hair, blood, and saliva was invalid because he was unable to read the consent form. The court found otherwise. That issue is not before us in this appeal.

2. For convenience, we shall use the term "such place" as including places, buildings, structures, and conveyances, in order to avoid having to repeat those terms.

used for such a purpose with knowledge or reasonable cause to know that the place is being, or is to be, used for such a purpose;

(c) to receive or offer or agree to receive any person into such a place for the purpose of prostitution, lewdness, or assignation or knowingly to permit any person to remain there for such a purpose;

(d) to direct, take, transport, or offer or agree to take or transport any person to any such place or to any other person with knowledge or reasonable cause to know that the purpose of such directing, taking, or transporting is prostitution, lewdness, or assignation;

(e) "[t]o procure or to solicit or to offer to procure or solicit for the purpose of prostitution, lewdness or assignation";

(f) to reside in, enter in any such place or remain in any such place for the purpose of prostitution, lewdness, or assignation; or

(g) to engage in prostitution, lewdness, or assignation by any means.

The three relevant terms—prostitution, lewdness, and assignation—are defined in § 16, as follows:

"The term 'prostitution' shall be construed to mean the offering or receiving of the body for sexual intercourse for hire. The term 'lewdness' shall be construed to mean any unnatural sexual practice. The term 'assignation' shall be construed to include the making of any appointment, or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement."

Although the record before us does not specify, anywhere, the particular offense Officer Giblin charged McNeil with committing, he has assumed throughout that the charge was under Article 27, § 15(e)—an assumption not contested by the State.[3] In the trial court, his argument on the motion to suppress was limited to the complaint that his conversation

---

3. The closest that the record comes to characterizing the offense for which McNeil was arrested in Baltimore City is in two narrative

with Officer Giblin had not progressed to the point of criminality under that section because no compensation had been discussed or agreed upon. His point was that "just asking for sex alone" is not a crime. *See* Transcript of Motion Hearing, July 22, 1997, at 45–46.

At the appellate level, he narrowed his assumption even further and asserted that he was arrested for soliciting for *prostitution*. From that premise, he has added the new, and quite different, argument that only the prostitute or possibly her procuring agent can be convicted of that offense—that it does not apply to a potential customer of the prostitute. In an unreported opinion, the Court of Special Appeals addressed that argument and affirmed. The court held that, under § 15(e), if the act of sexual intercourse had been completed, both parties to it could be convicted of prostitution, and thus both could also be convicted of soliciting for prostitution.

In his petition for *certiorari*, McNeil raised the question whether evidence was "unconstitutionally obtained from Petitioner because the undercover officer posing as a prostitute lacked probable cause to believe Petitioner was committing the crime of soliciting for purposes of prostitution." As subsidiary issues, he asked whether "the crime of soliciting for purposes of prostitution appl[ies] to a prospective customer of a prostitute" and whether, assuming that a prospective customer "can commit the crime of soliciting for purposes of prostitution," the facts of this case establish probable cause to believe that he was committing that offense. The question, of course, *assumes* that McNeil was, in fact, arrested for soliciting for *prostitution*. In its answer to the petition, the State seemed to accept that assumption, arguing that the Court of Special Appeals "correctly concluded that a prospective cus-

---

statements by Sergeant Clark. In his application for Statement of Charges in the instant case, he stated that McNeil was arrested "for soliciting an undercover police woman for sex." In an investigative police report, he stated that the arrest was "for soliciting sex." Those characterizations were obviously not intended to identify precisely the charge, as there is no offense of soliciting "for sex." It is not clear whether McNeil was ever actually prosecuted for the offense.

tomer of prostitution can commit the crime of solicitation." In its brief, however, though continuing to acknowledge that the arrest was pursuant to § 15(e), the State urges that McNeil's conduct at the very least constituted a solicitation for the purpose of lewdness, whether or not it also constituted a solicitation for the purpose of prostitution.

Once again, because of a lack of care in the framing and acceptance of issues—the failure to examine the record to make sure that there is a clear factual underpinning for the issue raised—we are in the position of having accepted jurisdiction over a case to address an issue that may have no factual basis. The question raised by McNeil—whether a prostitute's prospective customer can properly be charged with solicitation for the purpose of prostitution—does not necessarily arise with respect to solicitation for the purpose of lewdness or assignation under § 15(e), much less with respect to some of the offenses created in other subsections of § 15, with which McNeil might also have been charged.[4]

Were we inclined to agree with McNeil that the offense of solicitation for the purpose of prostitution does not apply to the conduct of a prospective customer, we would most likely have recalled the writ of *certiorari* and dismissed the petition as improvidently granted. As we do not agree with that view, however, we shall address the issue framed by him and, at least in its answer to the petition, accepted by the State.

### Statutory Intent And Construction

The principal issue before us is purely one of statutory interpretation—the scope and meaning of § 15(e). As we

---

**4.** Section 15(c), for example, makes it unlawful for a person to agree to receive another person in any conveyance for the purpose of prostitution, lewdness, or assignation. McNeil could very well have been arrested for agreeing to receive Officer Giblin in his car for one of those purposes. To the extent that it could be implied that he intended for the sexual acts to occur in his car, he might also have been charged under § 15(b)—occupying a conveyance for the purpose of prostitution, lewdness, or assignation. He might have been charged under § 15(d)—agreeing to transport a person to "any place" with knowledge that the purpose of the transporting was prostitution, lewdness, or assignation.

have so often said, "[i]n dealing with the issue of statutory construction, our goal is to discern and effectuate the intent of the legislature at the time it enacted the statute." *In re Adoption No. 12612*, 353 Md. 209, 233, 725 A.2d 1037, 1049 (1999). If the statutory language is clear and unambiguous and is consistent with the purposes of the legislation in general and the particular provision being interpreted, our inquiry usually ends at that point. If the language is unclear or ambiguous, "we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Id.* at 233–34, 725 A.2d 1037, quoting from *Philip Electronics v. Wright*, 348 Md. 209, 217, 703 A.2d 150, 153 (1997). McNeil concurs in this approach, noting that, because the statutory language has not changed since its enactment in 1920, consideration of the meaning of the language "in the context of the statute's setting and objectives requires that the Court 'recur to the history of the times when it was passed; and this is frequently necessary in order to ascertain the reason as well as the meaning of particular provisions in it.'" Petitioner's Brief at 6, 7, quoting in part from *Barnes v. State*, 186 Md. 287, 291, 47 A.2d 50 (1946).

As noted, § 15(e) makes it unlawful "[t]o procure or to solicit or to offer to procure or solicit for the purpose of prostitution, lewdness, or assignation." Read literally, giving the words their ordinary common meaning, that provision would seem, clearly, to apply to *anyone* who solicits for the purpose of prostitution—the prostitute or his/her agents who solicit potential customers and potential customers who solicit the prostitute. If we were to look only at § 15(e), therefore, we would conclude, as the California court did in *Leffel v. Municipal Court*, 54 Cal.App.3d 569, 126 Cal.Rptr. 773 (Cal. App.1976), that there is no ambiguity and that the statute applies to solicitations made by the potential customer of a prostitute. McNeil's argument hinges principally on the definition of "prostitution" in § 16, however—"the offering or receiving of the body for sexual intercourse *for hire*." (Emphasis added.) His point is that, in a prostitute/customer

relationship, only the prostitute's acts are done "for hire," *i.e.*, for compensation of some kind. From this, he jumps to the conclusion that a person "solicits for the purpose of prostitution if his or her purpose is to offer or receive the body for sexual intercourse and to perform that act for hire, i.e., for payment or compensation for the services rendered" and that "that individual is the prostitute, not the customer."

A second strand of his argument, based on the most cursory historical analysis, is the assumption that the 1920 Legislature that enacted the predecessor to § 15(e)—§§ 19, 19A, and 19B of Article 27 as it appeared in the 1914 Code—was so infected by a sexual double standard that it could not have intended the law to punish men who solicit women to engage in acts of prostitution, but only the female prostitutes themselves.[5] McNeil is wrong in both his statutory and his historical analysis, the two of which are intertwined.

McNeil may well be correct in ascribing an unfortunate gender bias to members of the 1920 General Assembly, for it was in that session that the Legislature refused to ratify the 19th Amendment to the United States Constitution, affording women the right to vote. But whatever social or political perspective may have induced that result, the evidence does not suggest a pernicious double standard with respect to the law in question here; indeed, when the entire enactment is read together, in harmony with the *zeitgeist* in which it was enacted, the only reasonable inference is to the contrary.

The 1920 law dealing with prostitution was not a legislative afterthought. It was, instead, part of a movement that was national in scope and that had a considerable history, both in Maryland and elsewhere. It is not necessary for us, in this Opinion, to recount the full history of efforts to combat

---

**5.** There are, and likely always have been, male prostitutes, but, at least in modern history, the great majority of professional prostitutes have been women with male clients, J. DECKER, PROSTITUTION REGULATION AND CONTROL (1979), at 16–17, and the principal focus of the anti-prostitution reform movement in this country has always been on the female prostitute.

prostitution and its related evils. Several excellent works have been done on that subject.[6] It is important to consider some of those efforts, however, for they have a bearing on what we perceive to have been the legislative intent.

We may begin by observing that, under English common law, although prostitution itself was not a crime, *lewdness* was punishable. Blackstone reports as an "offense" cognizable by the temporal courts "open and notorious *lewdness:* either by frequenting houses of ill fame, which is an indictable offense; or by some grossly scandalous and public indecency, for which punishment is by fine and imprisonment." He notes also that, in 1650, the "repeated act of keeping a brothel" and a second conviction for "committing fornication" were made felonies without benefit of clergy, but, at the restoration of Charles II, "it was not thought proper to renew a law of such unfashionable rigour," and those offenses were thereafter "left to the feeble coercion of the spiritual court, according to the rules of the canon law." WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, Vol. IV, Ch. 4, XI, at 64 (1769). Under Blackstone's conception of "lewdness," which differs considerably and is far broader than as defined in § 16 of Article 27, it appears that customers of the brothels—those who frequented houses of ill repute—were, indeed, subject to criminal sanction. Hawkins confirms that view, noting that one of the duties of constables was to arrest those who "resort to bawdy-houses, or keep suspicious company." W. HAWKINS, PLEAS OF THE CROWN, Vol. II, § 304 at 98 (1824); also M. HALE, HISTORIA PLACITORUM CORONAE, Vol. 2, at 88–89 (1847).

---

**6.** *See,* for example, J. DECKER, PROSTITUTION: REGULATION AND CONTROL, *supra;* R. ROSEN, THE LOST SISTERHOOD: PROSTITUTION IN AMERICA, 1900–1918 (1982); R. SYMANSKI, THE IMMORAL LANDSCAPE: FEMALE PROSTITUTION IN WESTERN SOCIETIES; H. BENJAMIN AND R. MASTERS, PROSTITUTION AND MORALITY (1964); D. LANGUM, CROSSING OVER THE LINE: LEGISLATING MORALITY AND THE MANN ACT; V. BULLOUGH AND B. BULLOUGH, WOMEN AND PROSTITUTION: A SOCIAL HISTORY (1987); B. HOBSON, UNEASY VIRTUE: THE POLITICS OF PROSTITUTION AND THE AMERICAN REFORM TRADITION (1990); T. MACKEY, RED LIGHTS OUT: A LEGAL HISTORY OF PROSTITUTION, DISORDERLY HOUSES, AND VICE DISTRICTS, 1870–1917 (1987); H. WOOLSTON, PROSTITUTION IN THE UNITED STATES (1921); M. CONNELLY, THE RESPONSE TO PROSTITUTION IN THE PROGRESSIVE ERA (1980).

We may assume that those common law principles applied in Maryland during the colonial period and were incorporated into our State common law in 1776 pursuant to Article 5 of the Declaration of Rights. Unsatisfied with the common law offenses, however, in 1715, by ch. 27, the Governor, Council, and Assembly made it a separate criminal offense, directly or indirectly, to entertain, provide for, or "frequent" any "lewd" woman after being admonished by the local minister, vestry, or churchwarden. The penalty for that offense was initially set at 30 shillings of money or 600 pounds of tobacco, in default of which the offender was subject to as many as 39 lashes. Our colonial and early Statehood tradition, therefore, clearly subjected the male customers of women who would now be (and likely were then) regarded as prostitutes, to criminal sanctions.

Although such women also could be prosecuted under a variety of laws, including those against adultery and fornication,[7] as a general rule prostitution itself was not prosecuted criminally in Maryland or other States prior to the end of the 19th Century. Rosen notes that "[b]efore the Progressive Era, Americans condemned prostitution but did not classify it as a criminal offense" and that "[s]ocial disapproval of prostitution was expressed through sporadic and unofficial harassment." In the 18th and early 19th centuries, she reports, the harassment was carried out mainly by gangs that acted as a kind of informal police and that "punished prostitution as they punished other violations of community standards, by mob attacks." THE LOST SISTERHOOD, *supra*, at 4. She continues that, by the mid–19th Century, "the task of harassing prostitutes had been taken over by the professional police departments just then being formed in major cities" and that prostitutes, madams, and procurers could be arrested, at the

---

**7.** Fornication, along with adultery, was an offense at common law and was recognized as such in Maryland as early as 1654. *See* ARCHIVES OF MARYLAND, Vol. I at 344–45. At least after 1749, if not before, the fornication law seemed to be invoked principally to deal with births out of wedlock. *See Oldham v. State*, 5 Gill 90 (1847); *Owens v. State*, 10 Md. 164 (1857). It was repealed in 1785.

discretion of the police, on charges of lewdness, vagrancy, or keeping a disorderly house. *Id. See* also THE IMMORAL LANDSCAPE, *supra,* at 83.

Beginning near the end of the 19th Century, however, and continuing through the first two decades of the 20th, societal interest in prostitution sharpened, leading to the enactment of specific anti-prostitution laws of one kind or another in most of the States. The scholars, who are not always in agreement with one another, posit several causes and impetuses for the movement, some focusing on the plight of the women entering and populating that profession, others on the penumbral ills thought to emanate from its increasing commercialization. Decker suggests five spurs: (1) a zealous moralistic campaign against vice generally; (2) an offshoot of the growing temperance movement—the linking of prostitution with the abuse of alcohol, especially in the brothels; (3) attempts, mostly on the part of women's organizations, to combat the double standard that demanded continence from women, but not from men; (4) concerns over the spread of venereal disease, which many attributed to prostitutes; and (5) a belief that there was organized trafficking in women for the purpose of prostitution. PROSTITUTION: REGULATION AND CONTROL, *supra,* at 67–69. There was also a concern over political corruption emanating from the brothels. A Vice Commission appointed in Maryland, of which we shall say more later, reported in 1915 "an incontestable fact that the disreputable saloons, gambling houses, houses of prostitution and disreputable furnished room houses [in Anne Arundel and Baltimore Counties] were all assured protection, provided they paid a certain sum of money or a certain pecuniary equivalent." MARYLAND VICE COMMISSION REPORT (1915), Vol. 4 at 1.

Prostitution followed quickly on the heels of the European settlements on the East Coast, the expansion westward, and Chinese immigration to the West Coast. Though practiced in the rural areas, it became more prevalent and more noticeable with the urbanization and industrialization of America, as young women emigrated from Europe or left the villages and farms in the United States to find work in the burgeoning

cities. Jane Addams noted in 1909 that "never before in civilization have such numbers of young girls been suddenly released from the protection of the home and permitted to walk unattended upon city streets and to work under alien roofs." CROSSING OVER THE LINE, *supra*, at 17, citing J. ADDAMS, THE SPIRIT OF YOUTH AND THE CITY STREETS (1909). Rosen points out that whereas in 1860 less than 10% of women worked in the labor force, by 1910 nearly 25% of the female population worked outside the home. THE LOST SISTERHOOD, *supra*, at 43.

The lot of these women was not always an easy one. Many of those who did not marry well or were not otherwise adequately supported by their families worked long hours for bare or sub-subsistence wages in domestic service or as laundry or factory employees. Melding into the economic imperatives facing some of those women was what Langum has characterized as the "alarming liberalization in sexual habits and attitudes, at least among young people of the working class." CROSSING OVER THE LINE, *supra*, at 17; *also* THE RESPONSE TO PROSTITUTION IN THE PROGRESSIVE ERA, *supra*, at 28–47. Langum and the Bulloughs note the greater number of men over women in the cities, leading some women to "flock[ ] to the dance halls and other places of amusement, often as a means of finding male companionship, and the open sexuality of their behavior, the new and untraditional dance forms, the drinking, and the hugging and kissing in public, shocked middle-class Americans." CROSSING OVER THE LINE, *supra*, at 19–20; WOMEN AND PROSTITUTION, *supra*, at 216. The perceived loosening of the higher moral values then expected of women was noted in Maryland as well, particularly in Baltimore. As noted by PAMELA HAAG, "COMMERCE IN SOULS": VICE, VIRTUE, AND WOMEN'S WAGE WORK IN BALTIMORE, 1900–1915, 86 Md. Hist. Mag. 292, 293 (1991):

> "Victorian conceptions of the 'scarlet woman,' foundered in the drastically transformed urban culture that reform-minded Baltimoreans confronted in the early twentieth century. With a population of 450,000—a 100 percent increase from 1870—Baltimore in 1913 displayed a panoply of cul-

tures and 'public women,' female wage earners who walked the streets, socialized in dance halls and alleyways, adorned themselves with make-up and, with these traits, complicated the urban middle class's attempts to understand their morality with the anachronistic nineteenth century terms of virtue and vice. . . .

Progressive reformers—all college-educated, predominantly of the professional or entrepreneurial classes, dramatically represented in Baltimore's *Social Register*—found Baltimore's newly incorporated economy and the 'lights and shadows' it generated profoundly disturbing and compelling."

The jolt to Victorian values from this general activity may, itself, have generated some of the reform movement that eventually turned its attention to the more pernicious "social evil" of prostitution, but the increasing commercialization of that calling was a particular, and possibly the more significant, spur.[8] As Rosen observes:

"Although prostitution had always been a commercial transaction, the striking changes in the *scale* of its commercialization just before the turn of the century made it seem especially dehumanizing and most flagrantly immoral. It

---

**8.** Some authors suggest that the shock over the apparent loosening of feminine moral values really stemmed from the view held by some at the time that men were innately unable to control their sex drive and that female sexuality was non-existent. *See* THE LOST SISTERHOOD, *supra,* at 5, 6. From that premise, it was a small step to regard prostitutes as truly "fallen women"—an aberrant subclass of women with a depraved and irredeemably lost reputation. Rosen notes that "[t]he belief that a virtuous woman could so easily become sexually depraved indicates an underlying male ambivalence about women's alleged sexuality." *Id.* at 6. There was a policy implication to that view, however, namely, the notion that prostitution actually served the useful purpose of providing an escape for the uncontrollable sexual appetite of men, and thus protected the more pure classes of womanhood. Rosen records the view expressed by W. LECKY, HISTORY OF EUROPEAN MORALS, 2:282–83, that "[t]he prostitute thus functions as the 'protector of the home,' " and "ultimately the most efficient guardian of virtue" in "servicing men's sexual needs as other women could not. . . ." Those holding that view, which included many women prominent in the reform movement, were often averse to abolishing prostitution.

had evolved from a small-scale, informal operation to a highly organized business that reaped vast profits and maintained connections with numerous third-party agents, including liquor interests, landlords, police, and politicians." THE LOST SISTERHOOD, *supra,* at 42; *see also* PROSTITUTION AND MORALITY, *supra,* at 96.

Reports began to surface—some exaggerated, some well-founded—of girls and young women being imported into the country from Europe and sold into economic and physical bondage as prostitutes; hence the notion of the "white slave." As early as 1875, the United States prohibited the importation of women for the purpose of prostitution (Act of Mar. 3, 1875, ch. 141, 18 Stat. 477 (repealed 1974)), and, in 1905, the Senate ratified an international treaty aimed at curtailing the trafficking of women for that purpose. International Agreement for the Suppression of the White Slave Traffic, May 18, 1904, 35 Stat. 426, 1 L.N.T.S. 83. Sensational stories, fanned by the news media, of the domestic interstate trafficking of women for prostitution and of young girls being held in confinement in brothels eventually led to enactment in 1910 of both State and Federal legislation aimed at curbing that activity. With only token opposition, Congress enacted the Mann Act, making it a felony, among other things, (1) to transport or aid in the transporting of a woman or girl in interstate commerce for the purpose of prostitution, debauchery, or any other immoral purpose, or (2) to persuade or assist in persuading a woman to travel in interstate commerce for such a purpose.[9] The Mary-

---

**9.** Some scholars have expressed the view that, while there were instances of organized trafficking in women for purposes of prostitution, the incidence of it was exaggerated. Langum notes: "Subsequent historians have disagreed about white slavery. Many students of the period have attributed the entire hysteria to a moral panic. Others have accepted that a considerable number of women were coerced prostitutes, while still another estimates that the extent of unwilling prostitutes was only about ten percent." CROSSING OVER THE LINE, *supra,* at 35. Rosen agrees that "[i]n their attempt to eliminate prostitution, reformers tended to exaggerate the extent of white slavery to prove the evils of uncontrolled and openly tolerated red-light districts." THE LOST SISTERHOOD, *supra,* at 114. Decker reports that later investigations showed that prostitution in the United States at the turn of the century

land Legislature, in the same year, enacted a comprehensive pandering law making it a felony to place a female in a house of ill fame or assignation against her will for purposes of prostitution, to place a female in a house of prostitution for immoral purposes (even if not against her will), to receive money for procuring or placing a female for the purpose of causing her to cohabit with a male person, to knowingly receive anything of value, without bona fide consideration, from the earnings of a woman or girl engaged in prostitution, to detain a girl or woman in a house of prostitution because of debts she contracted while living there, or to transport a woman or girl in any conveyance for the purpose of prostitution. *See* 1910 Md. Laws, ch. 25 at p. 92. Those provisions, as subsequently amended, now are codified as Article 27, §§ 426–433.

Apart from the attempt to control the "white slave" traffic through the Mann Act, most of the Federal concern over prostitution was directed at controlling venereal disease among the troops during World War I. In 1918, Congress made it unlawful to engage in, aid, or abet prostitution, procure or solicit for the purposes of prostitution, set up or operate a brothel, or receive "any person" in any vehicle, conveyance, place, or structure for purposes of lewdness, assignation, or prostitution within a reasonable distance of any military encampment. *See* 40 Stat. 885–86 (1918). There is a reference in Symanski's work to a "model Standard Vice Repression Law" drafted in 1919 by "the federal government," *see* THE IMMORAL LANDSCAPE, *supra*, at 83, but, even with the assistance of the Maryland State Library and the Library of Congress, we have been unable to locate it. Most of the energy was expended at the State and local level.

---

"was *not* (1) very 'organized,' (2) part of an elaborate 'trafficking' scheme, (3) involving only 'white' persons, nor (4) except for remote instances, actually 'slavery.' " PROSTITUTION; REGULATION AND CONTROL, *supra*, at 69–70. *Compare*, however, IMPORTING WOMEN FOR IMMORAL PURPOSES, Partial Report to Sixty-first Congress of the Immigration Commission, Sen. Doc. 196 (1909).

Maryland long recognized as common law offenses the keeping of a "disorderly house" and the keeping of a "bawdy house." A bawdy house was any place, including a room, a boat and a vehicle, kept open "for licentious commerce." *Lutz v. State*, 167 Md. 12, 16, 172 A. 354, 356 (1934). Keeping a disorderly house was the broader offense, and, indeed, included keeping a bawdy house. *Reynolds v. State*, 219 Md. 319, 325, 149 A.2d 774, 778 (1959); *Curley v. State*, 215 Md. 382, 390, 137 A.2d 640, 644 (1958). Until the last decade of the 19th Century, there were no fixed penalties for those offenses. In 1890 and 1892, the Legislature provided a penalty of six months and $300 for keeping a disorderly house and one year and $500 for keeping a bawdy house. *See* 1890 Md. Laws, ch. 523; 1892 Md. Laws, ch. 522. Available records show that those laws were enforced, at least in Baltimore City.[10] As noted, those laws were strengthened in 1910 with the enactment of the more comprehensive pandering law.

The reform movement was never of a single mind as to how best to control prostitution. Some were determined to abolish the practice entirely; others sought to adopt the system in vogue in some European cities of regulating prostitution by requiring that it be practiced in licensed brothels, where the women could be medically examined on a periodic basis; some desired to have the brothels concentrated in specific "red light" districts. Although the regulationists were initially in the ascendancy, by the end of the 19th Century the movement to regulate waned and the abolitionists predominated. THE LOST SISTERHOOD, *supra*, at 7–13; WOMEN AND PROSTITUTION, *supra* at 222–224. The attack on the brothels did not produce the desired result, however, and, in some respects, was coun-

---

**10.** The Reports of the Board of Police Commissioners of Baltimore City for 1917, 1918, and 1919 show 20, 25, and 8 arrests, respectively, for keeping a bawdy house. The majority of the persons arrested were women, which tends to confirm the findings of the Maryland Vice Commission that the brothels were run by madams. Although some of the defendants were dismissed at the station house level, most were prosecuted in criminal court. *See* REPORT OF THE BOARD OF POLICE COMMISSIONERS FOR THE CITY OF BALTIMORE (1917) at 29; (1918) at 28; (1919) at 30.

ter-productive. For one thing, many prostitutes did not operate out of brothels, but plied the streets. The Maryland Vice Commission reported that only 10% of the professional prostitutes in Baltimore were housed in brothels. MARYLAND VICE COMMISSION REPORT, *supra,* Vol. 1 at 370. As brothels were closed, some of the women working in them simply moved to other cities; others were added to the ranks of the streetwalkers, often falling under the control of pimps and incurring greater risk of injury from their customers. Few, it is reported, gave up the profession. They simply searched for business on the streets and in public places, causing arrests for streetwalking to jump. THE LOST SISTERHOOD, *supra,* at 32–33.

Between 1910 and 1920, cities and States throughout the country began creating vice commissions to examine the problem. At least 44 such commissions existed, including, as noted, one in Maryland, appointed by Governor Goldsborough in 1913. The Commission consisted of 14 persons, and it proceeded to make a comprehensive study of prostitution in Baltimore City, Anne Arundel and Baltimore Counties, and the cities of Frederick, Hagerstown, and Cumberland. In its 1915 five-volume, 800–page report, the Commission documented many of the circumstances and trends noted by similar commissions in other States and, ultimately, by the authors cited above. Although many of the doctors, lawyers, and other citizens the Commission surveyed recommended segregating, but tolerating, brothels, the Commission itself took a different approach, insisting that all brothels be closed and that the law target all third parties who profited from the work of the prostitutes. It summed up its view thusly:

"The effort should consist in trying to suppress the third party concerned,—that is, the person who is profiting by the immorality of others; who is commercializing it for his own gain; who is inducing men and women to have the sex relation in order that his [11] income may be increased; and

---

11. Use of the masculine pronoun in this passage probably should be taken as including women as well. Throughout its Report, the Vice Commission made reference to the predominance of women—mad-

who is stimulating the traffic beyond the bounds to which it would be carried by the natural sex instinct."

*Id.* at 445–446.

The Commission expressed the belief that "there is something fundamentally wrong with the character and mentality of the majority of women who accept the life of a prostitute" and doubted that there was "very little chance of reformation" for most of them (*id.* at 174), but its overall view seemed to be sympathetic to the prostitutes, if not to the madams, pimps, and other intermediaries. The Commission reported that poverty, low mentality, separation, immorality of one or both parents, and alcohol were the predominant factors in their family background, and that those who had been married before becoming prostitutes reported separation, non-support, marital disharmony, alcohol, and mistreatment. It was able to persuade 266 prostitutes to submit to medical examinations and found that 257 of them suffered from either syphilis or gonorrhea. *See* MARYLAND VICE COMMISSION REPORT, *supra,* Vol. 1 at 105. Throughout its Report, the Commission noted the multiple vulnerability of the prostitutes.

Although the Commission's clear principal aim was at the madams, pimps, and other procurers and intermediaries— including cab drivers, waiters, hotel bellboys, bartenders, and apartment janitors—rather than the prostitutes or their customers, the immediate legislative response was directed at the female prostitutes. It may be that the General Assembly thought at the time that the intermediaries had been sufficiently targeted and dealt with through the 1910 legislation on pandering and that the problem was one of law enforcement. By 1916 Md. Laws, ch. 653, the Legislature added to § 866 of the public local laws of Baltimore City, dealing with vagrants and vagabonds, a provision declaring that "every female person who shall solicit or procure or attempt to solicit or procure or who shall walk the streets for the purpose of soliciting or procuring any male person or persons to engage in sexual

---

ams—who ran the brothels, and it regarded them as a particularly evil and predatory group.

intercourse or in any other immoral practice with her or any other person for compensation or reward shall be deemed a common prostitute." Under §§ 867–873 of those public local laws, police officers were authorized, without a warrant, to arrest and remove to a station house any person charged with violating § 866. The arrestee could be tried at the station house before a justice of the peace or sent for trial to the Criminal Court of Baltimore, both having concurrent jurisdiction, and, upon conviction, the person was subject to imprisonment for a year and a $500 fine.[12]

Immediately upon the enactment of this public local law, the Baltimore City police began arresting women as "common prostitutes"—the statutory term. *See* REPORTS OF THE BOARD OF POLICE COMMISSIONERS, *supra* (1918) at 32; (1919) at 34. In 1918, by 1918 Md. Laws, ch. 83, the Legislature made it a Statewide misdemeanor to transport or aid or assist in transporting any person over any public way, in a public conveyance for hire, for purposes of prostitution or any other immoral or lewd purpose. It also, by 1918 Md. Laws, ch. 84, made it a statutory nuisance to maintain any place for purposes of lewdness, assignation, or prostitution. Such a nuisance was subject to abatement by injunction, upon petition by the State's Attorney, the Attorney General, or any citizen, and, upon any violation of an injunction, the violator was subject to a finding of contempt punishable by imprisonment for not less than three months nor more than six and a fine of $200 to $1,000. That approach, of using the civil law to abate the brothels, was then a common one among the States, having been inaugurated by Iowa as early as 1909. *See* WOMEN AND PROSTITUTION, *supra*, at 283.

It is with this background that the Legislature, in 1920, enacted what is now § 15 of Article 27. Several things are

---

12. The 1916 law followed an approach that was not uncommon at the time. In 1892, Congress enacted a law for the District of Columbia making it unlawful for "any prostitute or lewd woman to invite, persuade, or to address for the purpose of inviting, enticing, or persuading any person ... for the purpose of prostitution." *See Dinkins v. United States,* 374 A.2d 292, 297 n. 3 (1977).

apparent from that enactment. The most obvious and significant is that, in contrast to the 1916 statute, which applied only to "female persons who shall solicit" male customers for the purpose of prostitution and to the 1910 statute, which, though broad, still focused on pandering, the 1920 law was far more comprehensive. It extended beyond prostitution to include lewdness and assignation as well. It extended beyond the activity covered in the 1910 law—the operation of brothels and other places used for prostitution, and the procurement and transporting of women for that purpose—to target, for the first time, the soliciting of persons for that purpose, and the actual engaging in prostitution. In contrast to the 1910 and 1916 laws, it was also, in every important aspect, entirely gender-neutral in both language and approach.[13] In those regards, it followed closely the Federal legislation enacted during World War I. *See* 40 Stat. 885–86, *supra.*

The contrast, simply in language, with the 1916 approach is significant. Also significant is how the 1920 law was immediately perceived by the law enforcement community. Until advised otherwise by the Attorney General in 1922 (*see* 7 Op. Atty. Gen. 103), the Baltimore City police operated on the assumption that the 1920 Act did not abrogate by implication the 1916 public local law, so they enforced both. In 1920, they arrested 253 females and no males as common prostitutes under the 1916 law, but arrests were reported for 50 males and no females for "Prostitution, Lewdness and Assignation" under the 1920 law. REPORT OF THE BOARD OF POLICE COMMISSIONERS, *supra* (1920), at 34. The same pattern is revealed for 1921. *See id.* (1921) at 35. After being informed by the Attorney General that the 1916 law had been superseded, the arrests were only under the 1920 law, and the Reports show that a significant number of men were arrested. *See id.*

---

**13.** The only gender reference in the Act was the provision in § 19B that no girl or woman convicted under the Act could be placed on parole or probation in the care or charge of any person other than a woman probation officer designated by law or the court. That provision, obviously, was intended for the protection of the female defendant—usually the prostitute.

(1922) at 42 (115 males, 327 females); (1923) at 43 (140 males, 223 females); (1924) at 44 (52 males, 195 females). Although the conduct underlying these charges against the men is not specified, it seems clear that the charges did not arise from pandering, operating bawdy houses, or white slave law violations, as those categories were separately stated in the arrest reports, and it is not likely, in those years, that the men were, themselves, prostitutes. It would seem evident, then, that the police, at least in Baltimore City, where the problem seemed to be the greatest, construed the 1920 law as applying to both the prostitutes and their patrons.[14]

We concluded as much in *Lutz v. State, supra,* 167 Md. 12, 172 A. 354. The issue there was whether the 1920 law had repealed by implication the common law offense of keeping a bawdy house, for which the defendants had been arrested and convicted. After comparing the common law and statutory offenses, we held that they were directed at different objects—that the common law offense dealt with the specific nuisance of maintaining "a blatant and noisome establishment for licentious commerce, irrespective of whether such commerce involved hire or payment," whereas the statute "is directed at the suppression of sexual vice and perversion practiced for gain, and condemns equally those employed in connection with the commerce, *the patrons of the establishment used therefor, and the keeper thereof.*" *Id.* at 16–17, 172 A. at 356 (emphasis added). As McNeil points out, *Lutz* was concerned with bawdy houses, rather than solicitation for prostitution, but it does indicate our view, 65 years ago, that the legislative intent was to achieve the "suppression of sexual vice and perversion practiced for gain" by punishing "equally

---

14. A review of the annual reports of the Police Commissioner reveals that, in Baltimore City, the arrest of males under the prostitution statute has continued since those early days. In 1959, the police department subdivided the offense for reporting purposes and showed the arrest of 100 women and no men for prostitution, 11 men and 3 women for pandering, and, significantly, 42 men and 43 women for soliciting and procuring. That pattern was evident in 1960 and 1961 as well. *See* REPORT OF POLICE COMMISSIONER (1959) at 34–35; (1960) at 34–35; (1961) (no page number).

those employed in connection with the commerce," including the patrons.

The case principally relied on by McNeil is *In re Appeal No. 180,* 278 Md. 443, 365 A.2d 540 (1976), a case that, in fact, supports our view that the law applies to those who solicit prostitutes. A 15–year–old girl approached an undercover male police officer and offered to perform sexual intercourse with him for $25. For that conduct, she was found to be a delinquent child, on the premise that, had she been an adult, she would have been guilty of soliciting for prostitution under § 15(e). Presuming that the word "solicit," as used in § 15(e), has the same meaning as in the common law crime of solicitation, her argument—the exact converse of McNeil's—was that a prostitute cannot be convicted under § 15(e) for soliciting a customer because (1) the crime of solicitation requires the inducement of another to commit a crime, (2) prostitution is the offering or receiving of the body for sexual intercourse for hire, (3) as the customer does not offer or receive his/her body for hire, the customer does not commit the crime of prostitution by hiring the body of the prostitute, and (4) because the customer would not therefore commit the crime of prostitution by performing the act, he/she is not being induced to commit that crime by the conduct of the prostitute.

We found that argument "interesting and esoteric," but not persuasive. We held that the word "solicit," as used in § 15(e) "is to be read in the terms of its ordinary meaning and not with reference to the common law offense of solicitation." *Id.* at 443–44, 365 A.2d at 540. That, of course, destroyed the foundational underpinning of the argument. In reaching that conclusion, we considered the context in which the word "solicit" was used in other statutes and in cases from other States, and we also cited some standard dictionary definitions. McNeil finds comfort in the fact that some of the dictionary definitions and cases that we cited speak in terms of a woman or a female prostitute accosting a male. In the context of the case then before us, those articulations were not inappropriate, for that was the situation at hand. In holding that the Legislature intended the word "solicit" to be read broadly and

not in the limited manner of the common law offense, we did not need to determine whether the potential customer also could be criminally liable if he/she was the one who made the overture. It follows, however, that, if, as we held, the term has its "ordinary meaning . . . as understood and used by the general public," *id.* at 452, 365 A.2d at 544–45, it would necessarily include the conduct of the potential customer in soliciting the prostitute. The definition of "solicit" provided in WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY is:

"1. to ask or seek earnestly or pleadingly; to beg; to entreat; as, we *solicit* your support, he *solicited* them for help.

2. to tempt or entice (another) to do wrong.

3. to accost (another) for some immoral purpose, as a prostitute does.

4. to disturb; to disquiet. [Rare.]"

Any one of the first three definitions would suffice as an "ordinary meaning . . . understood and used by the general public." Even the third, which has the closest nexus to the issue before us, references a solicitation by a prostitute only as an example, not as a limitation. An entreaty, or offer, by a potential customer also qualifies as an accosting for some immoral purpose.

Given the historical background of § 15(e), as we have recounted it, and the construction we have placed on that section in *Lutz* and *Appeal No. 180*, it is clear to us that the crime of soliciting for prostitution stated in that statute covers the conduct both of the prostitute (and his/her agents) in soliciting potential customers and of the potential customer in soliciting the prostitute. We have considered the cases in other States cited by the parties and shall comment briefly on them. The more relevant ones support the conclusion that we reach as a matter of Maryland law.

McNeil calls our attention to *In re Carey*, 57 Cal.App. 297, 207 P. 271 (1922), cited by us in *Appeal No. 180*, as well as *People v. Jones*, 245 Ill.App.3d 810, 185 Ill.Dec. 832, 615 N.E.2d 391 (1993), *State v. Chandonnet*, 124 N.H. 778, 474

A.2d 578 (1984), and *People v. Anonymous,* 161 Misc. 379, 292 N.Y.S. 282 (1936) as supporting his view that § 15(e) applies only to the conduct of the prostitute. We shall deal with *Carey* first. It is a 1922 decision of an intermediate appellate court that reeks with a condescending attitude that has no place in today's jurisprudence. The opinion contains repeated allusions to the "fallen woman," who, in the mind of the authoring judge, "present[s] a greater single element of economic, social, moral, and hygienic loss than is the case with any other single criminal class." *Id.* at 304, 207 P. 271. That extraordinary notion aside, the court reached the conclusion that the gender-neutral language of then-current California solicitation law applied only to female prostitutes who solicit male customers on the wholly inaccurate belief that "men cannot commit the crime of carrying on the business of prostitution." *Id.* In the later, and far more sensible, case of *Leffel v. Municipal Court, supra,* 54 Cal.App.3d 569, 126 Cal.Rptr. 773, the California court declared the language used in *Carey* to be anachronistic and its holding that solicitation for prostitution can only refer to the act of the female prostitute in soliciting patrons for her business as "dictum and not binding as precedent." *Id.* at 575, 126 Cal.Rptr. 773. The *Leffel* court held that the statutory language "every person ... who solicits ... any act of prostitution" means what it says and that "*all persons,* customers as well as prostitutes, who solicit an act of prostitution are guilty...." *Id.* If *Carey* is not precedent in California, it has no value in Maryland. We regret having cited it in *Appeal No. 180.*

The other cases cited by McNeil, and a number of others not cited by him, do, indeed, construe the statutes at issue in those cases as not applying to the conduct of a potential customer. Most of those cases are distinguishable on their facts. They either construe statutory language that is unlike § 15(e) or are based on specific legislative history from which a clear intent to exclude the conduct of potential customers is evident. In *People v. Jones, supra,* 245 Ill.App.3d 810, 185 Ill.Dec. 832, 615 N.E.2d 391, the court held that the Illinois solicitation statute at issue applied only to panderers and

other intermediaries and did not apply either to the prostitute or the customer. As we made clear in *Appeal No. 180*, that is not the case with respect to § 15(e). In *State v. Chandonnet, supra*, 124 N.H. 778, 474 A.2d 578, the court relied, as evidence of legislative intent, on the report of the commission that drafted the law, which stated, expressly, that the law did not prohibit patronizing a prostitute. In *State v. Wilbur*, 110 Wash.2d 16, 749 P.2d 1295 (1988), the court simply held that a statute criminalizing only prostitution did not apply to the soliciting conduct of a potential customer. *See* also *Eisner v. Commonwealth*, 375 S.W.2d 825 (Ky.App.1964).

*People v. Anonymous, supra*, is of little value. For one thing, it is the decision of a single magistrate sitting in Brooklyn. Interestingly, it notes an earlier decision of the Court of General Sessions, *People v. Edwards*, 180 N.Y.S. 631 (1920), reaching the conclusion that the New York equivalent of our solicitation law did, indeed, apply to the conduct of the customer, but declares that decision *dicta* and declines to follow it. We are more persuaded by the 1920 *dicta*, enunciated at the very time our Legislature was considering the statute now before us. The New York statute at the time declared that "a person" who in any manner induces, entices, or procures a person to commit acts of lewdness, fornication, unlawful sexual intercourse, or other indecent acts was a vagrant. The *Edwards* court declared that "a person" includes men as well as women, and that "a man who induces, entices, or procures a woman to commit prostitution, either with himself or another, is a vagrant, and the man who aids or abets or participates in the commission of prostitution by a woman is a vagrant, and in either case is equally guilty as the woman." *Edwards, supra*, 180 N.Y.S. at 634–35. The court in *Edwards* went on to state a truism that bears repetition 80 years later:

"The court is aware that it has been the custom heretofore followed to arrest the women and let the men go; but the time has come when the custom cannot longer be permitted to continue.... The practical application of the law as heretofore enforced is an unjust discrimination against

women in the matter of an offense which, in its very nature, if completed, requires the participation of men."

We note that, in addition to California, the District of Columbia has interpreted its solicitation for prostitution statute as applying to the conduct of the customer and has affirmed convictions of customers for soliciting undercover police officers posing as prostitutes. *See Thompson v. U.S.,* 618 A.2d 110, 112 (D.C.App.1992) and cases cited therein.

### *Probable Cause*

■  As an alternative argument, presented in the context of whether there was probable cause for his arrest, McNeil contends that, even if § 15(e) applies to the conduct of a potential customer, in this case it was Officer Giblin who solicited him, not he who solicited her.  By walking the streets in "a known prostitution area," dressed in suggestive attire, she was, in his view, inviting passers-by to do business.  No doubt she was—that is what a sting operation is all about. The point he overlooks is that he beckoned to her, asked if she was working, made clear that he wanted her both to engage in sexual intercourse and perform fellatio, and, when she tacitly agreed, invited her into his car.  Although they had not discussed compensation, it was clear from her affirmative response to his inquiry as to whether she was "working" that McNeil expected to pay for the service.  Unquestionably, Officer Giblin had probable cause to believe that McNeil had just solicited her to commit an act of prostitution.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

ELDRIDGE, J., and RAKER, J., concur in the result only.

RAKER, Judge, concurring:

I join in the judgment of the Court affirming the judgment of conviction of Petitioner for the crimes of first degree rape, first degree sexual offense, kidnapping and the lesser included offenses.  I agree with the majority's conclusion that probable cause existed to support his arrest, and accordingly, the

evidence the police obtained as a result of that arrest was properly admitted into evidence against him. As the majority points out in footnote 4, probable cause to support Petitioner's arrest exists under any number of Maryland statutes.

To the extent that the majority exercises its discretion to consider the issue as framed by Petitioner, i.e., whether the offense of solicitation for the purpose of prostitution applies to the conduct of a prospective customer, I agree with the majority's conclusion that the statute includes the customer. However, I do not see the need for its unnecessary discussion of the history of prostitution, and I do not share its approach to the historical presentation and some of the inferences and innuendo it suggests. The plain language of the statute and the comparison between the 1920 statute and the 1916 statute lead to the conclusion that the statute includes the conduct of the customer.

I agree that historically the criminal justice system has treated female prostitutes and the male customers differently. Nonetheless, I would refrain from attempting to recount a historical perspective of this subject.[1] If we are to engage in an historical study to answer the question presented in the certiorari petition, i.e., that of the treatment of the customer under the statute, we should focus on the treatment of the customer throughout history, and not the salesperson. I agree with the observation of Ruth Rosen in *The Lost Sisterhood*, that the "subject of prostitution .... can function as a kind of microscopic lens through which we gain a detailed magnification of a society's organization of class and gender: the power arrangements between men and women; women's economic and social status...." R. ROSEN, THE LOST SISTERHOOD: PROSTITUTION IN AMERICA, 1900–1918 at xii (1982). She noted, in my view, correctly, that "writing history from 'above'—from the perspective of reformers who attempted to

---

**1.** *See* C. Chandler, *Feminists as Collaborators and Prostitutes as Autobiographers: Deconstructing an Inclusive Yet Political Jurisprudence*, 10 HASTINGS WOMEN'S L.J. 135, 141 ("The claim of 'merely describing facts' or stating the truth serves as a powerful rhetorical device.").

eradicate prostitution—would offer a fascinating but class-biased and one-sided picture of prostitution." *Id.* at xiii.

Having made the determination to look at the history of prostitution, it is important to explore the perspectives of the feminists and indeed, the prostitutes, "in order to achieve a broad understanding of how Americans of different classes and different sexes experienced and viewed prostitution." *Id. See, e.g.,* M. Baldwin, *Split at the Root: Prostitution and Feminist Discourses of Law and Reform,* 5 YALE J.L. & FEMINISM 47, 84 (1992); T. Clements, *Prostitution and the American Health Care System: Denying Access to a Group of Women in Need,* 11 BERKELEY WOMEN'S L.J. 49, 56 (1996); B. Cooper, *Prostitution: A Feminist Analysis,* 11 WOMEN'S RTS. L. REP. 99 (1989); H. Fechner, *Three Stories of Prostitution in the West: Prostitutes' Groups, Law, and Feminist "Truth",* 4 COLUM. J. GENDER & L. 26 (1994); A. Lucas, *Race, Class, Gender and Deviancy: The Criminalization of Prostitution,* 10 BERKELEY WOMEN'S L.J. 47, 49 (1994); A. Stremler, *Sex for Money and the Morning After: Listening to Women and the Feminist Voice in Prostitution Discourse,* 7 U. FLA. J.L. & PUB. POL'Y 189, 196 (1995). Prostitution is far too complex to be viewed solely from the perspective of the Victorian reformers.